954 A.2d 503

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. M.A., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued April 2, 2008—Decided August 29, 2008.

Before Judges LISA, LIHOTZ and SIMONELLI.

*Glenn A. Zeitz,* argued the cause for appellant (*Glenn A. Zeitz,* attorney; *Jordan G. Zeitz,* on the brief).

*Dana Citron,* Deputy Attorney General, argued the cause for respondent (*Anne Milgram,* Attorney General, attorney; *Ms. Citron,* of counsel and on the brief).

The opinion of the court was delivered by

SIMONELLI, J.S.C. (temporarily assigned).

A Somerset County grand jury indicted defendant for second and third degree theft by unlawful taking, contrary to *N.J.S.A.* 2C:20-3, stemming from his theft of over $650,000 from his employer. Defendant pled guilty after the denial of his motion to suppress evidence obtained from the warrantless search of a Sony Vaio laptop computer (the laptop) and an Ultra desktop computer (the tower) conducted pursuant to his employer's consent. On appeal, defendant contends that his employer had no authority to consent to the search because defendant, not the employer, owned the computers; and that he had a reasonable expectation of

privacy in personal information stored in the computers. We conclude the search was valid and defendant had no reasonable expectation of privacy in the content of the computers. Because we also conclude defendant's sentence was appropriate, we affirm.[1]

Defendant is no stranger to the criminal justice system. In October 1990, he was charged with two counts of forgery, contrary to *N.J.S.A.* 2C:21–1a(2), and one count of theft by deception, contrary to *N.J.S.A.* 2C:20–4. He was accepted into the Pretrial Intervention Program for twelve months and discharged on January 15, 1992. On February 15, 1992, defendant was charged with fourteen counts of forgery, contrary to *N.J.S.A.* 2C:21–1a(1) and (3), stemming from his theft of $221,871.05 from an employer. He pled guilty, was sentenced to five years probation, and was ordered to serve 364 days in the Middlesex County jail and to pay restitution. Defendant completed all conditions of probation, except restitution. A civil judgment was entered against him for the amount of the theft. Defendant was discharged from probation on May 17, 2002.

Defendant was still on probation in September 1997, when Joseph Braun, a majority owner of Certified Data Products (CDP),[2] hired him as a temporary bookkeeper primarily responsible for accounts payable.[3] CDP, located at 51 Old Camplain Road,

---

[1] We do not address defendant's contention that the trial judge should have continued bail pending appeal. This court denied defendant's emergent application for bail pending appeal. Thus, the issue has been decided on the merits. *State v. Cusick,* 116 *N.J.Super.* 482, 485, 282 *A.2d* 781 (App.Div.1971) (citing *State v. Smith,* 43 *N.J.* 67, 74, 202 *A.2d* 669 (1964), *cert. denied,* 379 *U.S.* 1005, 85 *S.Ct.* 731, 13 *L.Ed.2d* 706 (1965)). We also do not address the State's contention that defendant lacks standing to contest the search because this issue was not raised below. *Nieder v. Royal Indem. Ins. Co.,* 62 *N.J.* 229, 234, 300 *A.2d* 142 (1973) (quoting *Reynolds Offset Co. v. Summer,* 58 *N.J.Super.* 542, 548, 156 *A.2d* 737 (App.Div.1959), *certif. denied,* 31 *N.J.* 554, 158 *A.2d* 453 (1960)); *R.* 2:6–2.

[2] CDP and Braun may be sometimes hereinafter referred to collectively as "Braun."

[3] Braun was apparently unaware of defendant's criminal history.

Hillsborough,[4] manufactures adhesive backed labels. At the start of defendant's employment, Braun advised him "that the computers or anything in the office is company property." Also, defendant signed a non-disclosure of confidential information and non-compete agreement.

Defendant soon became a trusted employee. In January 1998, he became CDP's permanent full-time bookkeeper with increased job duties including invoicing, order entries, payroll, and bank and payroll records. Defendant's duties eventually expanded to include some operational matters, overseeing other employees, and assisting with sales by using the laptop to perform label printing demonstrations during sales calls.

Defendant had a private office at CDP, that had a door with a lock. Braun testified at the suppression hearing, the door was "never closed" and "never locked[,]" and the only time the door may have been closed was when defendant was on the phone; however, on weekends when defendant left, "it was always open." Defendant did not dispute Braun's testimony and admitted Braun "might have had [a key to the door]."

In addition to working for CDP, defendant owned a business known as Dynamic Data Solutions (DDS), through which he sold used computers and related equipment. CDP purchased approximately ten computers from DDS, which defendant installed. Because Braun had no computer training, and because defendant was an expert in computers, Braun also gave defendant computer responsibilities and relied on defendant for computer issues.

Defendant upgraded the company's computer system and established a computer network system. To log into the network system, employees used the same password[5] and then entered their name. Unbeknownst to Braun, defendant placed a separate

---

[4] In September 2001, CDP moved from Belle Mead to Hillsborough. Thus, any reference to defendant's "office" relates to the Hillsborough location.

[5] The password was "password."

password in the tower and laptop and stored personal information in them.

Once logged into the network, employees could log into the Zetex system.[6] The Zetex system had only two administrators, Braun and defendant, both of whom had equal access capabilities, and could "go in to see what anybody [logged-into the network] [was] doing at any given time[.]" Only Braun, his wife Petra,[7] and defendant could access CDP's financial records, including the electronic check registers.

On June 4, 2001, CDP purchased the tower from DDS for approximately $1500. The tower was connected to CDP's network, and located in defendant's office. According to Braun, defendant previously owned the laptop and brought it to work several times. In 2001, defendant was no longer using the laptop and wanted to get a new one. Because CDP needed a laptop, it purchased the laptop from defendant on September 7, 2001 for $500.[8] However, unbeknownst to Braun, in August 1999, defendant had used Braun's corporate credit card to purchase the laptop for $3017.99 and paid the credit card bill with a CDP check. Although defendant registered the laptop is his name, it was listed as an asset on the depreciation schedule of CDP's corporate tax returns.[9]

Label printing software and sample label designs were installed on the laptop. Defendant and a CDP salesperson used the laptop

---

[6] Zetex is a proprietary software for the label industry. It required employees to log into the system once they logged into CDP's network.

[7] Petra owned ten percent of CDP.

[8] Defendant testified at the suppression hearing the $500 was "a thank you for the extra hours that [he] put in" helping to move CDP's office to Hillsborough, not payment for the laptop. Braun denied this and said defendant possibly destroyed the records indicating the check was payment for the laptop.

[9] The laptop was not connected to CDP's network because defendant's attempt to connect it failed.

as a driver in sales demonstrations with prospective clients. Braun also used the laptop "a couple of times just to play with it." Braun testified when the laptop was not in use it was either on the salesperson's desk, the salesperson took it home, or it was left "in the back area of the offices" near the sales cubicles. Braun also testified defendant might have taken the laptop home once or twice after CDP purchased it because defendant helped with sales demonstrations.

Without Braun's knowledge, defendant called CDP's payroll company and increased his salary from approximately $40,000 per year to $125,000 per year. Braun discovered this unauthorized salary increase on June 17, 2002, and confronted defendant. Defendant admitted stealing approximately $8000, and gave Braun a check in that amount.[10] Braun immediately terminated defendant and did not permit him to re-enter his office because he "was very concerned about what [defendant] could do in a very short period of time because he knew a lot about the computer." However, Braun permitted defendant to return the next day to gather his personal belongings. Defendant never returned and did not claim ownership or request return of the computers; and there is no evidence he did so prior to the search.

Braun did not immediately report the theft to the police because he was unsure of the amount stolen. By September 17, 2002, Braun believed defendant stole approximately $500,000 and reported the theft to the Hillsborough Township Police Department. Braun advised the police that CDP owned the computers, and he signed two consent forms consenting to their search by the New Jersey State Police High Technology Crimes Investigation and Support Unit.

The State Police were advised that the purpose of the search was to locate CDP checks written by defendant and their amounts. A search of the tower revealed eight CDP checks with vendor information. It also revealed webpage information; a Prudential

---

[10] The check was subsequently returned for insufficient funds.

Securities Stock Account in defendant's mother's name; online trading information; and wire transfers from CDP's account to defendant or defendant's mother.

The State Police also searched the laptop and issued an Electronic Evidence Analysis Report for both computers, which was admitted in evidence at the suppression hearing, but was not supplied on appeal. We are unable to determine what information, if any, was obtained from the laptop.

Separate and apart from the information revealed by the search, DDS' Fleet Bank records, obtained via a grand jury subpoena, and CDP's bank records confirmed the theft. Those records revealed the following: (1) from January 2000 to December 2000, defendant issued several CDP checks in the aggregate of $116,062.94 to Spinnaker Coating, Inc. (Spinnaker), a customer with which CDP did several hundred thousand dollars of business; (2) from July 2000 to December 2000, defendant issued several CDP checks to DDS in the aggregate of $66,300; (3) from January 2001 to December 2001, defendant issued CDP checks to DDS in the aggregate of $221,548.40; (4) defendant issued several CDP checks to himself in the aggregate of $8200; (5) defendant wired $10,000 of CDP's funds to his mother's Prudential account; and (6) defendant withdrew $11,369.31 from CDP's payroll account at PNC Bank. Defendant deposited all of the checks, including those issued to Spinnaker, into DDS' Fleet Bank account.

Because defendant removed all of the fraudulent checks from CDP's records, the record is unclear as to the exact amount of the theft. However, Braun eventually obtained a civil judgment against defendant for $769,631.51, representing $655,935.95 in damages and $113,695.56 in pre-judgment interest.

Defendant filed a motion to suppress evidence obtained from the computers, contending that Braun did not have authority to consent to their search because he did not own them. Defendant testified he owned the laptop; Braun consented to his use of the corporate credit card to purchase it; he reimbursed Braun for it; and kept it home approximately three days out of the five-day

work week. Defendant also testified the tower was his personal computer, which was shipped to CDP when he purchased it because "no one was [at DDS' office] to sign for it"; and he brought the tower to work[11] because an intern was temporarily using the computer that had been in his office. Defendant said he placed confidential passwords on the computers to protect his personal files and information.

The motion judge found Braun's testimony to be "worthy of belief clearly and convincingly," and found "the responses of the defendant were implausible[.]" The judge rejected defendant's claim that he owned the computers, finding clearly and convincingly that Braun owned them because defendant charged the laptop on the corporate credit card unbeknownst to Braun; Braun purchased the laptop from defendant for $500; the placing of the laptop on CDP's depreciation schedule clearly demonstrated "that the ownership was reposed in [Braun]"; and Braun instructed defendant when defendant began his employment that all computers were company property.

The motion judge also found Braun executed the two consent forms "contemporaneously with his production of the computers to the Hillsborough Township Police for subsequent[ ] forensic analysis by the New Jersey State Police[ ]"; the consents were properly executed; and "as the owner of the computers and the business Mr. Braun rightly had the absolute standing to allow the . . . Hillsborough Police ultimately to turn the computers over to the state police in order to search the computers." The judge concluded "the search of the computers and any and all such information obtained from the search, including records regarding and referring to [defendant's mother], were properly obtained by the police and were not in violation of any of the case law, statute, or court rules cited by the defendant."

---

[11] Defendant did not recall if he told Braun or anyone at CDP that he was bringing the tower to work.

Defendant entered a conditional guilty plea in exchange for a recommended seven-year term of imprisonment, with no period of parole ineligibility,[12] and the State's agreement that he could argue for a lower sentence. Defendant preserved his right to appeal the denial of the suppression motion, to request continuation of bail pending appeal, and to challenge the sentence.

Defendant was sentenced in accordance with the plea agreement to a seven-year term of imprisonment with no period of parole ineligibility on the second degree theft charge, and to a concurrent four-year term of imprisonment with no period of parole ineligibility on the third degree theft charge. The judge also imposed the appropriate assessments and fees, and ordered restitution in the amount of the civil judgment.

Defendant first contends that we must exercise our original jurisdiction, pursuant to *Rule* 2:10–5, and make findings and conclusions because "there was no competent or credible evidence that [ ] Braun was the lawful owner of either the [laptop or tower]." We disagree.

Our review of a trial judge's findings is "exceedingly narrow." *State v. Locurto,* 157 *N.J.* 463, 470, 724 *A.*2d 234 (1999) (citing *State v. Johnson,* 42 *N.J.* 146, 161–62, 199 *A.*2d 809 (1964)). In reviewing a motion to suppress, we "must uphold the factual findings underlying the trial court's decision so long as those findings are 'supported by sufficient credible evidence in the record.'" *State v. Elders,* 192 *N.J.* 224, 243, 927 *A.*2d 1250 (2007) (quoting *Locurto, supra,* 157 *N.J.* at 474, 724 *A.*2d 234); *State v. Alvarez,* 238 *N.J.Super.* 560, 562–64, 570 *A.*2d 459 (App.Div.1990). We "should defer to the trial courts' credibility findings that are often influenced by matters such as observations of the character and demeanor of witnesses and common human experience that are not transmitted by the record." *Locurto, supra,* 157 *N.J.* at 474, 724 *A.*2d 234 (citing *State v. Jamerson,* 153 *N.J.* 318, 341, 708

---

[12] Defendant faced a fifteen-year term of imprisonment.

*A*.2d 1183 (1998)); *Dolson v. Anastasia,* 55 *N.J.* 2, 7, 258 *A*.2d 706 (1969); *Johnson, supra,* 42 *N.J.* at 161, 199 *A*.2d 809. We should not change the trial court's findings simply because [we] "might have reached a different conclusion were [we] the trial tribunal[ ]" or because "the trial court decided all evidence or inference conflicts in favor of one side[.]" *Johnson, supra,* 42 *N.J.* at 162, 199 *A*.2d 809. Rather, we should only modify a trial court's findings if they are so clearly mistaken and "so plainly unwarranted that the interests of justice demand intervention and correction[.]" *Ibid.* "In those circumstances solely should [we] 'appraise the record as if [we] were deciding the matter at inception and make [our] own findings and conclusions.'" *Elders, supra,* 192 *N.J.* at 244, 927 *A*.2d 1250 (quoting *Johnson, supra,* 42 *N.J.* at 162, 199 *A*.2d 809).

■ Based upon our careful review of the record, we are satisfied the judge's factual and credibility findings are amply supported, and there is substantial credible evidence that Braun, not defendant, owned the computers. We emphasize that the record is devoid of evidence that defendant claimed ownership or sought return of the computers before the search. To be sure, defendant instituted no legal action for the return of what he claimed was his lawful property. Simply put, he did not do so because he did not own the computers. Braun owned them. Because Braun owned the computers, he had the authority to consent to their search; and because Braun voluntarily consented to the search, the search was valid. *State v. Maristany,* 133 *N.J.* 299, 305, 627 *A*.2d 1066 (1993) (citing *State v. Johnson,* 68 *N.J.* 349, 353–54, 346 *A*.2d 66 (1975)); *State v. Rice,* 115 *N.J.Super.* 128, 131, 278 *A*.2d 498 (App.Div.1971) (citing *Bumper v. North Carolina,* 391 *U.S.* 543, 548–49, 88 *S.Ct.* 1788, 1791–92, 20 *L.Ed.*2d 797, 802–03 (1968)).

Our inquiry does not end here. Defendant contends that he had a reasonable expectation of privacy in the personal information he stored in the computers because he had a private office and placed confidential passwords on the computers to block third party

access to that information. We first note that defendant's personal information was not the focus of the search; it did not confirm the theft; and the record is silent as to whether it played a role in the indictment.

Further, "[f]or purposes of search-and-seizure analysis," a defendant who abandons property "no longer retain[s] a reasonable expectation of privacy with regard to it at the time of the search." *State v. Carroll,* 386 *N.J.Super.* 143, 160, 899 *A.*2d 998 (App.Div.2006) (citations omitted). "In the context of the Fourth Amendment a defendant 'abandons' property when he voluntarily discards, leaves behind or otherwise relinquishes his interest in the property in question ..." *State v. Farinich,* 179 *N.J.Super.* 1, 6, 430 *A.*2d 233 (App.Div.1981) (citing *United States v. Colbert,* 474 *F.*2d 174, 176 (5th Cir.1973)), *certif. denied,* 88 *N.J.* 497, 443 *A.*2d 711 (1981), *aff'd o.b.,* 89 *N.J.* 378, 446 *A.*2d 120 (1982); *see also Carroll, supra,* 386 *N.J.Super.* at 160, 899 *A.*2d 998; *State v. Gibson,* 318 *N.J.Super.* 1, 11, 722 *A.*2d 960 (App.Div.1999). The evidence establishes that defendant abandoned the computers before the search. Thus, he had no expectation of privacy in them. Nevertheless, we extend our inquiry to consider the merits of his contention.

The Fourteenth Amendment[13] and the New Jersey Constitution[14] provide protection against an unreasonable search and seizure. *Rakas v. Illinois,* 439 *U.S.* 128, 134, 99 *S.Ct.* 421, 425, 58 *L.Ed.*2d 387, 395 (1978); *State v. Eckel,* 185 *N.J.* 523, 537–38, 888 *A.*2d 1266 (2006); *State v. McAllister,* 184 *N.J.* 17, 29, 875 *A.*2d 866 (2005); *State v. Carty,* 170 *N.J.* 632, 639, 790 *A.*2d 903 (2002); *State v. Hempele,* 120 *N.J.* 182, 195, 576 *A.*2d 793 (1990); *State v. Novembrino,* 105 *N.J.* 95, 145, 519 *A.*2d 820 (1987); *Johnson, supra,* 68 *N.J.* at 353–54, 346 *A.*2d 66. In some instances, the New Jersey Constitution protects certain confidential or personal

---

13 *U.S. Const.* amend. XIV.

14 *N.J. Const. of 1947,* art. I, ¶ 7.

information. *Doe v. Poritz,* 142 *N.J.* 1, 89–90, 662 *A.*2d 367 (1995) (citing *Hennessey v. Coastal Eagle Point Oil Co.,* 129 *N.J.* 81, 96, 609 *A.*2d 11 (1992)); *see also McAllister, supra,* 184 *N.J.* at 26–27, 875 *A.*2d 866 (bank records); *State v. DeLuca,* 168 *N.J.* 626, 631–32, 775 *A.*2d 1284 (2001) (information stored in a personal pager); *Hempele, supra,* 120 *N.J.* at 203, 576 *A.*2d 793 (curbside garbage); *State v. Hunt,* 91 *N.J.* 338, 348, 450 *A.*2d 952 (1982) (long distance phone records).

However, "[t]o invoke the protections of the Fourth Amendment and its New Jersey counterpart, . . . defendant must show that a reasonable or legitimate expectation of privacy was trammeled by government authorities." *State v. Evers,* 175 *N.J.* 355, 368–69, 815 *A.*2d 432 (2003) (citing *Smith v. Maryland,* 442 *U.S.* 735, 740, 99 *S.Ct.* 2577, 2580, 61 *L.Ed.*2d 220, 226 (1979); *State v. Marshall,* 123 *N.J.* 1, 66, 586 *A.*2d 85 (1991), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993)); *see also Hempele, supra,* 120 *N.J.* at 200, 576 *A.*2d 793; *Doe, supra,* 142 *N.J.* at 90, 662 *A.*2d 367. "To meet this test, [the defendant] must establish that he had both 'an actual (subjective) expectation of privacy,' and 'one that society is prepared to recognize as reasonable.'" *Evers, supra,* 175 *N.J.* at 369, 815 *A.*2d 432 (quoting *Katz v. United States,* 389 *U.S.* 347, 361, 88 *S.Ct.* 507, 516, 19 *L.Ed.*2d 576, 588 (1967) (Harlan, J., concurring)); *Marshall, supra,* 123 *N.J.* at 66, 586 *A.*2d 85. "In other words, a 'reasonable' expectation of privacy encompasses not only an individual's expectation but also society's willingness to recognize that expectation as reasonable." *State v. Sloane,* 193 *N.J.* 423, 434, 939 *A.*2d 796 (2008) (citing *California v. Ciraolo,* 476 *U.S.* 207, 211, 106 *S.Ct.* 1809, 1811, 90 *L.Ed.*2d 210, 215 (1986)); *see also Hempele, supra,* 120 *N.J.* at 200, 576 *A.*2d 793 (social norms dictate whether an expectation of privacy exists and/or is reasonable) (citations omitted).

We first address defendant's misapplication of *State v. Reid,* 194 *N.J.* 386, 945 *A.*2d 26 (2008)[15] and *Doe v. XYC Corp.,* 382 *N.J.Su-*

*per.* 122, 887 *A.*2d 1156 (App.Div.2005). In *Reid,* our Supreme Court held that Article I, Paragraph 7, of the New Jersey Constitution protects an individual's privacy interest in the subscriber information he or she provides to an Internet service provider. *Id.* at 389, 945 *A.*2d 26. The Court reasoned that "when users surf the Web from the privacy of their homes, they have reason to expect that their actions are confidential." *Id.* at 398, 945 *A.*2d 26. However, Reid's crime involved the Internet and information divulged by an Internet service provider, and it occurred at home through the use of Reid's personal computer, which she never brought to work or permitted co-workers to use. Thus, *Reid* does not apply.

In *XYC Corp.,* one issue we addressed was "whether defendant employer could monitor [an employee's] use of his workplace computer in the context of civil litigation brought by a third-party claiming injury resulting from those computer activities." *XYC Corp. supra,* 382 *N.J.Super.* at 138, 887 *A.*2d 1156. We held that the defendant's e-mail policy, and the employee's lack of a legitimate expectation of privacy in his workplace computer, permitted the employer to monitor the employer's computer use. *Id.* at 138– 39, 887 *A.*2d 1156. Specifically noting that *Doe* "is not a criminal case", we cited federal cases holding that, in the criminal context, employees have no reasonable expectation of privacy in a workplace computer. *Id.* at 137, 887 *A.*2d 1156; *see United States v. Angevine,* 281 *F.*3d 1130, 1133–35 (10th Cir.) (no reasonable expectation of privacy in contents of workplace computer which was part of employer's network), *cert. denied,* 537 *U.S.* 845, 123 *S.Ct.* 182, 154 *L.Ed.*2d 71 (2002); *United States v. Simons,* 206 *F.*3d 392, 398 (4th Cir.2000) (no legitimate expectation of privacy in contents of workplace computer where the employer had notified its employees that their computer activities could be moni-

---

[15] At the time defendant filed his merits brief, our Supreme Court had not decided *Reid.* Thus, defendant relied on this court's decision in *State v. Reid,* 389 *N.J.Super.* 563, 914 *A.*2d 310 (App.Div.2007).

tored); *United States v. Bailey*, 272 *F.Supp.*2d 822, 830–32, 836–37 (D.Neb.2003) (no reasonable expectation of privacy in the contents of workplace computer where employee did not own it, and was provided passwords to access the employee's network and company data).

■ Guided by these federal cases, we conclude that defendant had no reasonable expectation of privacy in the personal information stored in his workplace computer. Braun owned the computers and kept them in CDP's office; Braun advised defendant at the inception of his employment that all CDP computers were company property; the tower was connected to CDP's network system, and the laptop contained business software; Braun had equal access to the computers, and a co-worker had access to the laptop; and defendant's private office was never closed or locked.

■ Even if defendant had a subjective expectation of privacy because he used a confidential password, that expectation was unreasonable under the facts of this case. As noted in *Rakas:*

> Obviously, ... a "legitimate" expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as "legitimate." [*Rakas, supra*, 439 *U.S.* at 128, 143 n. 12, 99 *S.Ct.* at 431 n. 12, 58 *L.Ed.*2d at 402, n. 12.]

We conclude, therefore, that neither the law nor society recognize as legitimate defendant's subjective expectation of privacy in a workplace computer he used to commit a crime.

■ We now address defendant's sentence. Defendant contends that the judge should have found mitigating factor *N.J.S.A.* 2C:44–1b(11) (imprisonment will result in excessive hardship to defendant), and should have sentenced him to a five-year term of imprisonment, because he has advanced AIDS, compounded by diabetes and coronary artery disease. We disagree.

■ The standard of review of a sentence is as follows:

> [A]ppellate review of a sentencing decision calls for us to determine, first, whether the correct sentencing guidelines ... have been followed; second, whether there is

substantial evidence in the record to support the findings of fact upon which the sentencing court based the application of those guidelines; and third, whether in applying those guidelines to the relevant facts the trial court clearly erred by reaching a conclusion that could not have reasonably been made upon a weighing of the relevant factors.

[*State v. Roth,* 95 *N.J.* 334, 365–66, 471 *A.*2d 370 (1984).].

The "standard is one of great deference and '[j]udges who exercise discretion and comply with the principles of sentencing remain free from the fear of second guessing.' " *State v. Dalziel,* 182 *N.J.* 494, 501, 867 *A.*2d 1167 (2005) (quoting *State v. Megargel,* 143 *N.J.* 484, 494, 673 *A.*2d 259 (1996)). "The test is not whether a reviewing court would have reached a different conclusion on what an appropriate sentence should be; it is whether, on the basis of the evidence, no reasonable sentencing court could have imposed the sentence under review." *State v. Tarver,* 272 *N.J.Super.* 414, 435, 640 *A.*2d 314 (App.Div.1994) (citing *Roth, supra,* 95 *N.J.* at 364, 471 *A.*2d 370).

Prior to imposing a sentence, "a trial court should identify the relevant aggravating and mitigating factors, determine which factors are supported by a preponderance of the evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence." *State v. O'Donnell,* 117 *N.J.* 210, 215, 564 *A.*2d 1202 (1989) (citing *State v. Kruse,* 105 *N.J.* 354, 359–60, 521 *A.*2d 836 (1987)). Assuming the trial court properly balanced the mitigating and aggravating factors, we should not substitute our judgment for that of the trial court. *Id.* at 220, 564 *A.*2d 1202. With these standards in mind, we review defendant's contention.

The judge found aggravating factors *N.J.S.A.* 2C:44–1a(3) ("[t]he risk that defendant will commit another offense"); *N.J.S.A.* 2C:44–1a(6) ("[t]he extent of defendant's prior criminal record and the seriousness of the offenses of which he has been convicted"); and *N.J.S.A.* 2C:44–1a(9) ("[t]he need for deterring defendant and others from violating the law"). The judge also found mitigating factor *N.J.S.A.* 2C:44–1b(6) (defendant will compensate the vic-

tim),[16] and concluded "[t]he aggravating factors clearly outweigh the mitigating factors and the plea agreement was reasonable."

The only reference in the record to defendant's medical condition is found in a pre-sentence report,[17] where defendant reported his health was poor; "the medications he was previously taking for his HIV are no longer working and he is now a part of a study group taking two experimental medications[;]" he "goes to the Presbyterian Hospital in Philadelphia to see his physician"; and he takes the following medications once daily: Truvada, Lipitor, and Altace; and he takes the following medications twice daily: Preszista, Norvir, and two experimental drugs, TMC125 and MK0518. Defendant submitted no medical evidence to the judge indicating the severity of his condition, or that his medical needs could not be adequately met in prison.[18]

■ In AIDS cases, mitigating factor *N.J.S.A.* 2C:44–1b(11) can be found, and, if sufficiently severe can, in the sentencing court's discretion, provide a basis for overcoming the presumption of imprisonment if the condition "rendered [the defendant's] status extraordinary and 'idiosyncratic[,]' " and where the defendant had a "prognosis of imminent death within six months[.]" *State v. E.R.*, 273 *N.J.Super.* 262, 265, 274–75, 641 *A.2d* 1072 (App.Div. 1994) (quoting *State v. Jabbour*, 118 *N.J.* 1, 7, 570 *A.2d* 391 (1990)). *Compare State v. Lebra*, 357 *N.J.Super.* 500, 511–12, 815 *A.2d* 1020 (App.Div.2003) (defendant's sentence of probation, conditioned on serving 362 days in the county jail instead of state prison with an eighty-five percent period of parole ineligibility, reversed

---

[16] Given defendant's failure to pay restitution to his previous employer, the judge was not convinced he would do so here.

[17] Defendant also submitted a pre-sentence memorandum to the judge, but he has not submitted it on appeal.

[18] The medical records contained in defendant's Confidential Appendix were not submitted to the judge. We cannot consider these documents. *Soc'y Hill Condo. Ass'n Inc. v. Soc'y Hill Assocs.*, 347 *N.J.Super.* 163, 177–78, 789 *A.2d* 138 (App.Div.2002).

because despite being diagnosed with a brain tumor, the record disclosed nothing beyond that diagnosis to indicate defendant's needs could not be adequately met in prison.)

Based upon our review of the record, we discern no reason to disturb defendant's sentence, as it is amply supported by the record. Although the judge did not express his reasons for excluding mitigating factor *N.J.S.A.* 2C:44–1b(11), this error was harmless given defendant's failure to request this mitigating factor; his failure to provide supporting medical evidence, *see Dalziel, supra,* 182 *N.J.* at 505, 867 *A.*2d 1167; and his prior criminal record. Also, unlike the defendant in *E.R.,* defendant was not bedridden and facing imminent death within six months. Rather, he was functioning at a reasonable level; he was undergoing active treatment; and there was nothing in the record indicating his needs could not be adequately met in prison. If defendant's condition deteriorates, he may seek relief pursuant to *Rule* 3:21–10(b)(2).

Affirmed.

954 A.2d 514

DMITRIY KOTLER, PLAINTIFF–APPELLANT, v. NATIONAL RAILROAD PASSENGER CORPORATION ("AMTRAK"), DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 22, 2008—Decided August 29, 2008.