**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0549-17T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

GABRIEL GARCIA, a/k/a GABRIEL H.
GARCIA, GABRIEL H. CHIRIBOGA,
GABRIEL G. CHIRBOGA, and
GABRIEL H. GARCIACHIRIBOGA,

    Defendant-Appellant.

_____

Argued September 10, 2019 – Decided September 27, 2019

Before Judges Yannotti, Currier, and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 16-12-1529.

Marcia H. Blum, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Marcia H. Blum, of counsel and on the brief).

Ednin D. Martinez, Assistant Prosecutor, argued the cause for respondent (Esther Suarez, Hudson County

Prosecutor, attorney; Jaimee M. Chasmer, Assistant Prosecutor, on the brief).

PER CURIAM

Defendant Gabriel Garcia appeals from his convictions and sentence following a jury trial. After a review of the contentions in light of the record and applicable principles of law, we affirm the convictions. However, because we find counts two and three should merge with count one, we remand solely for correction of the amended judgment of conviction (JOC).

Defendant was charged in an indictment with second-degree aggravated assault (count one), N.J.S.A. 2C:12-1(b)(1); third-degree possession of a weapon with an unlawful purpose (count two), N.J.S.A. 2C:39-4(d); fourth-degree unlawful possession of a weapon (count three), N.J.S.A. 2C:39-5(d); and fourth-degree aggravated assault (count four), N.J.S.A. 2C:12-1(b)(3). Count four was dismissed before trial. A jury found defendant guilty of all charges.

At the sentencing hearing, the trial judge merged the second-degree and fourth-degree aggravated assault convictions[1] and sentenced defendant to a term of seven years with an eighty-five percent period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The judge also merged

---

[1] Because the fourth-degree charge was dismissed before trial, the judge corrected this error in an amended JOC.

the third-degree possession of a weapon with an unlawful purpose and the fourth-degree unlawful possession of a weapon convictions, and sentenced defendant to a term of three years to run concurrently.

We derive the facts from the evidence presented at trial. At around midnight on the night of these events, defendant drove to his mother's home in Jersey City to pick up some relatives. Upon his arrival, defendant double-parked outside the house and honked his horn "about three times" to alert his uncle he had arrived.

At the same time, Raymond and Jennifer Urbanski, and Jennifer's brother Jason were conversing on the same street a few doors away from the Urbanski home. Raymond testified that when he heard defendant beeping his horn, he got off his stoop and gestured with his hands for defendant to "keep it down;" however, defendant "continued blasting the horn." Raymond assumed defendant could not see him and he approached defendant's vehicle. In response, defendant got out of the vehicle, brandishing a knife.

Raymond felt "immediately threatened" and "went into defense mode." He and defendant began a verbal altercation while "walking down the block a few doors down." Raymond thought he had "to get [the] knife from [defendant]" but before he could, Raymond saw defendant raise the hand holding the knife.

3

As Raymond put his hand up to block defendant, he stated defendant sliced him with the knife on his finger and face, from the corner of his eye to the side of his mouth. Raymond said he was "soaked" in blood. He denied having any weapons with him and he did not recall ever striking defendant.

As a result of the slashing, Raymond said he "lost skin on [his] finger" that "had to be grafted from the palm of [his] hand." He also suffered nerve damage, a fracture on his pinky finger, and needed twenty-six stitches on his face.

After defendant stabbed Raymond, Jennifer tried to insert herself between the two men. As she did so, defendant brandished the knife at her and told her to take Raymond away. Defendant then got into his vehicle and left.

The Jersey City police and Detective Janixza Domenech arrived at the scene five to seven minutes later. Domenech testified Raymond was bleeding from the left side of his face as she interviewed him. She described seeing a deep laceration on Raymond's face from his left ear lobe to the corner of his mouth.

Shortly after the interview, defendant returned to the scene in his car and was arrested by the police. Domenech briefly interacted with defendant and did not note any injuries on him. However, when she was shown a photograph of

A-0549-17T4

defendant taken later that night, she saw a "minor injury" underneath defendant's hairline.[2] Jennifer also identified defendant as Raymond's attacker during a subsequent show up procedure.

During her investigation of the incident, Domenech made observations, canvassed the scene, and interviewed witnesses. She testified that she observed blood stains on the driver's side door and the rear passenger door of defendant's car and on the sidewalk in front of a home next to the Urbanski's. She canvassed the scene for "additional weapons, cameras, [and] witnesses." She stated she did not recover any weapons and did not interview any witnesses other than Jennifer, because no other witnesses were found.

Prior to the start of trial, defendant advised the court he intended to assert a claim of self-defense. He also testified about the events that evening. Defendant stated that after he honked his horn, Raymond and two other men came to his car window. When Raymond began "cursing" at defendant and asking why he was beeping the horn, defendant responded that he was waiting for his uncle to come out of the house. After Raymond struck the roof of

---

[2] At trial, Domenech identified a photograph of defendant taken at the time of his arrest. The photograph was admitted into evidence.

defendant's vehicle and continued cursing at him, defendant got out of his vehicle.

Defendant stated that Raymond "swung" at him with his fist. He stated he kept backing away because he saw one of the other men had "something in his hand." When Raymond and the others "rush[ed]" at defendant, he ran away. The men "chas[ed]" defendant back to his vehicle, where one of the men "stabbed" the vehicle's rear tires. Defendant stated he tried to get back into his car but Raymond, who had a bottle in his hand, punched him.

Defendant stated he was able to run away and pull a box cutter out of his pocket.[3] He told Raymond and the other men to "back up" and stated he did not want any problems. However, the men charged defendant, so he ran around his car to the front of his mother's house. He stated the men continued to pursue him, and they were armed with a bottle, a knife, and a stick.

At this point, defendant testified, several of his relatives came out of the house, including his mother, stepfather, sister and uncle. When defendant's mother tried to stop Raymond and the other men, they pushed her out of the way. Defendant again told the three men to "stop," but one of them hit him with a

---

[3] Defendant, a mechanic, testified he owned a box cutter to open boxes for his job.

"bottle on the side of [his] head" and then they all came towards him. Defendant "panicked" because the men were "all on top" of him and he brought his hand that was holding the box cutter up, stabbing Raymond.

After the stabbing, defendant ran to his car. As he drove away, he stated the men were "still running towards [him]" and punching the windows of the vehicle. One of his relatives told him later that after defendant left, Raymond told defendant's family members that he was "going to murder one of [them]."

Defendant called the police and explained what had occurred, and then contacted his friend, Jonathan Colon, a Jersey City police officer. Colon advised defendant to stay at the scene. Defendant remained parked on the block but did not return to his mother's house because he was "scared for [his] life."

Shortly thereafter, defendant saw a police car travelling towards the scene and he decided to follow it there. Once defendant parked, Raymond came to the window of the car "and started . . . swinging his fist and catching [defendant] in the face." An officer arrested defendant and when he tried to explain what had transpired, a police officer told him to "shut up." Later, defendant was taken to a hospital, where he received six staples to his head.[4]

---

[4] Defendant acknowledged on cross-examination that the medical records revealed he had received four surgical staples.

A-0549-17T4

Defendant's mother testified that she heard a commotion outside her house. When she went outside, she saw four men armed with bottles, knives and sticks around her son. When she tried to get between them, they attacked and pushed her. She then saw one of the men hit her son on his head with a bottle. She said her son tried to defend himself and "slashed the person in the face."

When defendant's stepfather heard screams, he also ran out of the house where he saw defendant surrounded by five people; two were holding knives, one had a bat, and a fourth had a bottle. He stated he saw one of the men strike defendant's head with a bottle.

Defendant's family members testified that they tried to talk to the police officers, but the police ignored them. None of them tried to talk to the detective, although defendant's mother stated she was aware that the detective was conducting an investigation. The family said the police "just wouldn't listen," told the family members to "back off," and the female detective "never asked [them] anything." The State did not cross-examine defendant's family members on their interaction with the police officers. Additionally, defendant's sister stated she showed a police officer a video of Raymond threatening her family; however, the officer did not ask for a copy of the video. Although defendant's

A-0549-17T4

sister did not see the stabbing, she stated she saw Raymond punch defendant twice in the head and face after defendant returned to the scene.

On the final day of trial, after defendant had testified, defense counsel sought to introduce a video Jorge Salgado[5] had taken of defendant's mother and stepfather attempting to talk to the police about Raymond's threat to "murder them." Defense counsel advised she had only learned of the videotape's existence the night before.

The State objected to the introduction of the video because of its untimely production. Defense counsel argued the video was important because it would corroborate the testimony she expected her remaining witnesses to give that the police officers ignored defendant's family members. The trial judge denied the introduction of the videotape at that juncture because the defense witnesses had not yet testified, and, therefore, the State had not attempted to impeach their allegations that the police had ignored them. The judge told defendant that he could not introduce the video unless the State impeached his mother's or stepfather's version of events.

---

[5] Salgado lived with defendant's mother and other relatives in the home. It is unclear from the record if he was also a relative.

Following the testimony of defendant's witnesses, the judge conducted a hearing on the video outside the presence of the jury. As the video was played, Salgado identified who was speaking at certain points in the footage as the speaker's faces were not visible. He identified defendant's mother and stepfather as the speakers in the video who were explaining to the officers that Raymond threatened them and that they possessed an additional video (taken by defendant's sister) that captured the threats. In response, the officers told them to "take [the video] to court." Additionally, at the beginning of the video, the officers told defendant's family, "that's for court," "[t]hat's not for now," and "if [defendant] did nothing wrong he should have stayed" at the scene of the incident.

After seeing the video, the trial court inquired of defense counsel her grounds for the video's admission. Defense counsel argued that Domenech testified that no one came forward to offer themselves as witnesses of the events, and therefore the video would rebut that testimony. The State responded that the video was "cumulative" and "needless," and challenged its authentication because Salgado had not established a foundation for identifying the speakers.

In denying the introduction of the video, the trial judge found it did not meet the requirements of any hearsay exception because the State did not

10

suggest during the cross-examination of defendant's mother or stepfather that they had only recently fabricated their testimony about trying to speak to the police and being rebuffed. He also noted the video showed the officers did not tell the relatives to "go away" but told them to "take it to court."

In his closing argument, the prosecutor stated:

> And then, again, the family's all outside and – and they're supposedly out there and nobody cares what they have to say. And his mother testifies and there was an important little part of that testimony that I want to emphasize to you and I think is relevant to figure out what happened here, that the mother knew the difference between a police officer and a detective.[6] She knew that police officers don't have the same role, that they get there and they help secure a scene, they do this and that. But the detectives, the detectives are the people who investigate, who take the witness statements, who try to get the picture here. And she described the person, who's Detective Domenech, who came here and told you nobody approached her, nobody approached her, nobody from the Garcia family as he would have you believe approached her.
>
> Despite the fact that she was clearly a detective she's walking around with a notebook, she's taking notes, she's talking to the Urbanski's, she's trying to figure out what happened. And knowing this they still (indiscernible) and talk to her. If this really happened like that, you running out there for your son, you're

---

[6] Defendant's mother testified that she knew Domenech was a detective because she was carrying a notebook and was speaking to Jennifer. She also stated she knew a detective conducted an investigation, which differentiated her from a police officer.

going to tell the people, the police at the scene, the detectives at the scene, those charged with the investigation that, no, this -- there's something else going on here. But she never did, she never did. And that should rule large in your mind.

In addressing defendant's claim of self-defense, the prosecutor stated:

Again, this [sic] wounds or these actions, they were not defensive. They were offensive. Once again, ladies and gentlemen, this wasn't inflicted by some guy and … on his heels with his back against the wall. This wasn't inflicted by some guy who had nowhere else to go and who with his head down just flings his arm up with his blade and he just happened to take it out at that exact moment. That's someone who went on the attack. . . . A person cannot leave the safety of their car, menace somebody with a knife and then claim self-defense. A person cannot brandish a knife against another in the presence of his wife and his family and then claim self-defense.

A person cannot turn down routes of retreat and then claim their actions were defensive. This was not inadvertent or negligent or reckless or the product of self-defense, ladies and gentlemen. That was an attack.

Following its deliberations, the jury found defendant guilty on all counts.

On August 11, 2017, the trial court held a sentencing hearing. Defendant did not present any mitigating factors but maintained his innocence, explaining he stabbed Raymond in self-defense, he had a wife and two children, and had a job to support his family.

A-0549-17T4

The State requested consecutive sentences on the counts and requested a finding of aggravating factors two, the gravity and seriousness of harm inflicted upon the victim, N.J.S.A. 2C:44-1(a)(2); three, the risk of re-offense, N.J.S.A. 2C:44-1(a)(3); six, the extent of defendant's prior criminal record[7] and the seriousness of the offenses of which he has been convicted, N.J.S.A. 2C:44-1(a)(6); and nine, the need to deter defendant and others from violating the law, N.J.S.A. 2C:44-1(a) (9). Additionally, the State asserted the only applicable mitigating factor was factor eleven, N.J.S.A. 2C:44-1(b)(11), the resulting hardship on defendant's family.

In its decision, the trial court found aggravating factors three, six, and nine were applicable. For factor three, the trial court explained that "[t]his is [defendant's] seventh indictable conviction" in thirteen years.[8] The court found factor six applicable because of "the extent of the defendant's prior criminal record and the seriousness of the offenses for which he has been convicted." And for factor nine, the trial court found defendant "needs to be deterred" based on his criminal record and because the altercation could have been avoided.

---

[7] Defendant had previous convictions of resisting arrest, possession of an imitation firearm for an unlawful purpose, and possession of a controlled dangerous substance.

[8] At the time of sentencing, defendant was thirty-one years old.

The court also addressed the merger of the counts. He determined the assault conviction and the weapons charge could not be merged because: 1) someone could "commit an aggravated assault . . . without a weapon"; and 2) "there are different factors and different requirements and different elements of the crime." However, the trial court merged the unlawful possession of a weapon and possession of a weapon with an unlawful purpose counts.

Subsequently, the trial court sentenced defendant to concurrent terms of imprisonment: seven years of imprisonment for the second-degree aggravated assault conviction, with an eighty-five percent period of parole ineligibility under NERA; and three years of imprisonment for the merged unlawful possession of a weapon and possession of a weapon with an unlawful purpose convictions.

On appeal, defendant presents the following arguments:

> POINT I. THE DETECTIVE'S TESTIMONY THAT NO ONE FROM DEFENDANT'S FAMILY CAME FORWARD TO SPEAK TO THE POLICE AT THE SCENE IMPLIED THAT HIS FAMILY HAD NOTHING EXCULPATORY TO SAY AND UNDERMINED DEFENDANT'S CLAIM AT TRIAL THAT HE ACTED IN SELF-DEFENSE, YET THE COURT EXCLUDED A VIDEO THAT SHOWED DEFENDANT'S PARENTS HAD ATTEMPTED TO SPEAK TO THE POLICE AT THE SCENE.

POINT II. IN A TROUBLING INSTANCE OF MISCONDUCT, THE PROSECUTOR CAPITALIZED ON THE EXCLUSION OF THE VIDEO TO MISSTATE A SIGNIFICANT FACT AND, ON THAT BASIS, URGE THE JURY TO CONVICT DEFENDANT.

POINT III. THE PROSECUTOR MISSTATED THE LAW ON SELF-DEFENSE, TELLING THE JURY THAT BECAUSE DEFENDANT INITIALLY "BRANDISHED" A KNIFE, HE WAS NOT ENTITLED TO CLAIM THAT HE SUBSEQUENTLY ACTED IN SELF-DEFENSE.

POINT IV. THE CONVICTIONS FOR POSSESSION OF THE KNIFE, UNDER COUNTS 2 AND 3, SHOULD HAVE MERGED WITH THE ASSAULT UNDER COUNT 1.

POINT V. THE SENTENCE OF SEVEN YEARS, 85 PER CENT WITHOUT PAROLE, IS EXCESSIVE.

Defendant asserts that the trial judge erred in denying the introduction of the videotape into evidence because it was proffered to support the defense testimony refuting Domenech's statement that no one from the family came forward to speak to the police during the investigation at the scene. Because it could be inferred from Domenech's statement that the family had nothing exculpatory to say or could not corroborate defendant's claim of self-defense, defendant argues the video was needed to bolster the defense witnesses's

15

credibility. Defendant contends the video was not hearsay or if it was, it was admissible under N.J.R.E. 803(a)(2).

We review a trial court's evidentiary ruling for an abuse of discretion, that is, whether "there has been a clear error of judgment." State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)). We will "not substitute [our] own judgment for that of the trial court, unless 'the trial court's ruling was so wide of the mark that a manifest denial of justice resulted.'" Ibid.; accord State v. Prall, 231 N.J. 567, 580 (2018).

On the last day of trial, when defense counsel sought the introduction of the videotape, she did not articulate the specific rule governing the admissibility of the video. Neither counsel nor the judge questioned whether the videotape was hearsay; instead, the judge, without objection, analyzed the hearsay exceptions that might permit the introduction of the video. He determined that the only exception that might be applicable was Rule 803(a)(2), but rejected that rule as it did not fit in the presented circumstances.

Rule 803(a)(2) permits the admission of a prior consistent statement of a witness if it is "consistent with the witness' testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive." Because the judge found the prosecutor had not asserted

or even implied there was a recent fabrication by any of the defense witnesses, he concluded the defense had not met its burden to demonstrate a hearsay exception and he denied the admission of the tape.

We disagree that the video was hearsay and therefore subject to a hearsay exception prior to its admission into evidence. Hearsay is defined as "a statement,[9] other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.J.R.E. 801(c). Here, the video was being offered by defendant to rebut Domenech's testimony that no one from his family came forward to discuss the incident. The video depicted family members talking to the police, contrary to the detective's assertion. It was not offered for the truthfulness of the statements in the video, but rather to show that those statements were made.

However, although we disagree with the judge's reasoning for the exclusion of the video, we discern no abuse of discretion in his ruling based on the information presented to the judge. Furthermore, defendant has not demonstrated the exclusion of the video deprived him of a fair trial. The issue

---

[9] Under N.J.R.E. 801(a), a "statement" can include a writing. A video is considered a writing under N.J.R.E. 801. See State v. Sheppard, 197 N.J. Super. 411, 430-31 (Law Div. 1984); State v. Bottomly, 208 N.J. Super. 82, 86 (Law Div. 1984). Thus, a video can be considered hearsay.

before the jury was whether defendant acted in self-defense when he stabbed Raymond. The State's and defense witnesses presented conflicting versions of the incident.

The video did not offer any evidence to prove or disprove defendant's theory of self-defense. It showed defendant's family fleetingly speaking with police officers, not the detective. Defendant's mother and stepfather testified to those conversations at trial. The failure to admit the video, when viewed in the context of the evidence, does not support that defendant was prejudiced or deprived of a fair trial.

We turn next to defendant's argument, first raised on appeal, of prosecutorial misconduct during the State's summation. Defendant contends the prosecutor "misused" the trial court's ruling excluding the video "to exhort the jury to find [him] . . . guilty." He argues the prosecutor improperly implied that defendant's family's failure to speak with Domenech on the night of the incident meant defendant did not act in self-defense when he stabbed Raymond. He also asserts the prosecutor "misle[d] the jury about the law governing the self-defense claim," in arguing: "A person cannot brandish a knife against another in the presence of his wife and his family and then claim self-defense."

A-0549-17T4

As there was no objection to the prosecutor's remarks, we review them for plain error. State v. Daniels, 182 N.J. 80, 95 (2004) (citing State v. Macon, 57 N.J. 325, 333 (1971)). We must determine whether the remark was improper and, if so, whether it was "'clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2).

If defense counsel does not object to the prosecutor's remarks, "the remarks will not be deemed prejudicial" as "[t]he failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made." State v. Frost, 158 N.J. 76, 84 (1999).

In countering defense counsel's comments during her summation that the police investigation was one-sided, the prosecutor commented on the evidence presented to the jury. The remark that defendant's mother did not approach Domenech was not refuted by either defendant's mother or the excluded videotape. The tape only showed family members interacting with police officers. The prosecutor's remark was based on reasonable inferences from the testimony elicited at trial. Defendant's mother testified that she knew Domenech was a detective because she was carrying a notebook and was speaking to Jennifer. She also stated she knew detectives conducted an investigation, which differentiated them from police officers. Thus, it was not unreasonable for the

prosecutor to question defendant's mother's credibility and for the prosecutor to comment that defendant's mother did not speak to Domenech for reasons not favorable to defendant.

We are unpersuaded by defendant's argument that the prosecutor misled the jury as to the law governing his self-defense claim. After describing the severity of Raymond's injuries, the prosecutor argued they were incurred from an offensive attack by defendant, and not from self-defense as defendant claimed. Although the prosecutor's comment regarding brandishing a knife was subject to several interpretations, the judge subsequently charged the jury on the law of self-defense. In reviewing the closing argument as a whole, as we must, we cannot conclude the comments were "so egregious" that it deprived defendant of the "right to have a jury fairly evaluate the merits of his defense." State v. Wakefield, 190 N.J. 397, 438 (2007) (quoting State v. Smith, 167 N.J. 158, 181-182 (2001)).

Defendant also argues his counsel was ineffective in her arguments regarding the videotape. We decline to address this argument as we find it more appropriate for a post-conviction relief application, and not an issue that can be resolved on this trial record.

We briefly address defendant's arguments regarding his sentence. He asserts his sentence is excessive because the trial court found "the aggravating factors . . . based on mistakes concerning the nature of [defendant's] record" and "failed to consider an applicable mitigating factor." We affirm a sentence "as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record." State v. Lawless, 214 N.J. 594, 606 (2013) (quoting State v. Natale, 184 N.J. 458, 489 (2005)).

To be accorded such deference, the sentencing court is required to "identify the relevant aggravating and mitigating factors, determine which factors are supported by a preponderance of evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence." State v. O'Donnell, 117 N.J. 210, 215 (1989) (quoting State v. Kruse, 105 N.J. 354, 359-60 (1987)); accord State v. M.A., 402 N.J. Super. 353, 370 (App. Div. 2008); see also N.J.S.A. 2C:43-2(e); R. 3:21-4(g). Here, we are satisfied the judge's findings regarding the three aggravating factors are supported by the record.

As to mitigating factors, defendant did not argue any specific factor at the sentencing hearing but defense counsel advised the judge that defendant "comes from a great family," "has a wife and two children," and works to support them.

The State mentioned that factor eleven, N.J.S.A. 2C:44-1(b)(11), the resulting hardship on defendant's family, might be applicable.

Although the judge did not specifically reference mitigating factor eleven, he did note the presence of defendant's wife and young children crying in the courtroom. Mitigating factor eleven applies where "imprisonment of the defendant would entail excessive hardship to himself or his dependents." N.J.S.A. 2C:44–1(b)(11). However, it is clear that the mere fact that a defendant has children does not require a trial court to find mitigating factor eleven. State v. Dalziel, 182 N.J. 494, 505 (2005). Instead, a defendant must demonstrate that the children are dependents who will suffer an excessive hardship if the defendant is incarcerated. Ibid.

Here, defendant did not establish any basis for the judge to find the factor. Defense counsel argued that defendant supported his family, but did not provide any additional information as to whether the family would experience "excessive hardship" from defendant's incarceration. Thus, there was not "ampl[e]" evidence in the record supporting a finding of mitigating factor eleven. Id. at 504. In assessing the aggravating and mitigating factors, the judge found the aggravating factors "substantially outweigh[ed]" the mitigating factors. Even if he had considered one mitigating factor, it would not have changed the balance.

A-0549-17T4

Defendant also presents an argument regarding the merger of the counts. He asserts the second-degree assault conviction should merge with the third-degree possession of a weapon with an unlawful purpose and fourth-degree unlawful possession of a weapon convictions. We agree. Defendant's testimony that he carried a box cutter for his employment as a mechanic was undisputed. The possession of the knife itself was not unlawful. It was only unlawful because it was used in the aggravated assault, therefore used for an unlawful purpose.

We, therefore, remand solely for the trial court to correct the amended JOC to reflect the merger of counts two and three into count one.

Affirmed in part, and remanded for entry of a second amended JOC. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0549-17T4