23 A.3d 489

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
JOHN RAY WILSON, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted February 15, 2011—Decided July 26, 2011.

Before Judges CARCHMAN, GRAVES and MESSANO.

*Wronko & Loewen,* attorneys for appellant (*James R. Wronko,* of counsel; *Mr. Wronko* and *Gilbert G. Miller,* on the brief).

*Paula T. Dow,* Attorney General, attorney for respondent (*Russell J. Curley,* Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

GRAVES, J.A.D.

A jury convicted defendant John Ray Wilson of manufacturing marijuana, *N.J.S.A.* 2C:35–5(a)(1). Defendant, who was diagnosed with Multiple Sclerosis (MS) in 2002, argues on appeal that he was

entitled to a "personal use defense" and his sentence is excessive. For the reasons that follow, we affirm.

A State grand jury charged defendant with first-degree maintaining or operating a production facility for manufacturing marijuana, *N.J.S.A.* 2C:35–4 (count one); second-degree manufacturing of marijuana in an amount greater than ten but less than fifty plants, *N.J.S.A.* 2C:35–5(a)(1) and *N.J.S.A.* 2C:35–5(b)(10)(b) (count two); and third-degree possession of psilocybin mushrooms, *N.J.S.A.* 2C:35–10(a)(1) (count three). The court denied defendant's motion to dismiss counts one and two of the indictment on March 20, 2009, and it subsequently granted the State's motion *in limine* to bar defendant from asserting a personal use defense and from referencing his medical condition at trial. ·

On December 17, 2009, a jury acquitted defendant of count one, but found him guilty of counts two and three. The trial court determined the presumption of imprisonment for a second-degree crime had not been overcome, and it imposed a five-year prison term on count two and a three-year concurrent term on count three. The court also granted defendant's application for bail pending appeal.

Defendant presents three arguments for our consideration:

*POINT I*

THE TRIAL COURT ERRED BY HOLDING THAT THE MEDICAL/PERSONAL USE OF MARIJUANA WAS NOT AVAILABLE AS A DEFENSE TO A CHARGE OF MANUFACTURING MARIJUANA.

*POINT II*

THE TRIAL COURT ERRED BY BARRING THE DEFENSE EXPERT, DR. DENNIS PETRO, FROM TESTIFYING ABOUT THE BENEFICIAL EFFECT OF MARIJUANA ON MULTIPLE SCLEROSIS AND BY PRECLUDING MR. WILSON FROM REFERRING TO HIS MULTIPLE SCLEROSIS.

*POINT III*

MR. WILSON'S SENTENCE IS MANIFESTLY EXCESSIVE.

Based on our examination of the record, the briefs, and the applicable law, we conclude that defendant received a fair trial and his sentence is not excessive or unreasonable.

On August 18, 2008, a National Guard helicopter was conducting a "marijuana search mission" over Somerset County. A possible "marijuana grove" was discovered, and GPS coordinates of the target area were relayed to State Police officers on the ground. Officers Matthew Mancil and William Peacock drove to the location, an old farm house on approximately one acre of land.

When Mancil and Peacock arrived, they immediately observed "the tops of several marijuana plants ... [at] the end of the driveway." The officers exited their vehicle and spoke with defendant, who was standing in the yard. Both officers testified that when asked if he knew why the police were at his house, defendant responded it was because of the marijuana plants. Defendant then signed a *"Miranda* [1] Warning Acknowledgement Card" and a consent form for "a complete search of [the] residence, yard, and out buildings."

Peacock, who was qualified as an expert witness "in the areas of marijuana and cultivation of marijuana," described the search as follows:

> A. ... [W]e checked the area in the backyard for additional marijuana plants other than the ones we immediately saw when we drove up to the [house].
>
> Q. And what did you see when you examined his backyard?
>
> . . . .
>
> A. We noticed there were trails ... [that] started from [the] yard and they led from plant to plant. The trails were worn through the grass all the way down to the bare earth. If you followed the trail, it led you from plant to plant to plant through the yard.
>
> . . . .
>
> Q. After looking at the trails and seeing where they led, did you examine the plants themselves?
>
> A. Yes, I did.
>
> Q. And what did you see?
>
> A. We found 17 ... marijuana plants that were just ringed around that yard from trail to trail to trail.
>
> Q. Approximately how tall [were] the plants?
>
> A. Between five and six-[feet] tall.

---

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

. . . .

Q. Based on your opinion, were the plants well-cared for?

A. Yes, they were.

Q. What did you base that opinion on?

A. ... They were very high, they appeared very lush.... The ground around [them] was loose and it appeared they'd been watered recently. You could see the trails going through there. Somebody had been by those plants almost daily.

The officers also discovered plant food and "Miracle–Gro Quick Start Planting and Transplant Starting Solution."

While searching defendant's residence, the officers recovered "a small amount of marijuana" and a plastic bag containing psilocybin mushrooms in his bedroom. However, neither officer recalled asking defendant why he was growing marijuana or what he was going to do with it.

Defendant testified in his own defense. When asked if he was "in the process of growing" the seventeen marijuana plants, he responded, "Yes, I was." Defendant admitted he purchased marijuana seeds "over the Internet" and planted about twenty of them:

Q. ... [Y]ou planted [the marijuana] seeds, is that correct?

A. Yes.

Q. You went out and cultivated the land and tilled it ...?

A. I didn't till it, I just kind of broke it up a little with a shovel to loosen the dirt.

Q. But you cleared the land in anticipation of planting, is that right?

A. I mean, it's a little space, not a large space, a foot space, a foot-and-a-half.

Q. A foot-and-a-half, and you did that 20 times?

A. Yeah.

Q. For 20 different seeds?

A. Yes, I did.

Q. ... You didn't do any follow-up care?

A. I watered.

. . . .

Q. So ... over a course of two-and-a-half months, [you] made sure that these plants were going to grow and be healthy?

A. That's what I was trying to do, yes.

In addition, to impeach the officers' credibility, defendant was allowed to testify he told Mancil and Peacock he was using the marijuana to treat his MS symptoms.

 In his first point, defendant argues that he should have been allowed "to present a personal use defense" to count two, which charged him with manufacturing marijuana under *N.J.S.A.* 2C:35–5. According to defendant, "the Legislature intended a personal use exemption to apply to all facets of the manufacturing process specified in the definition of manufacturing." In response, the State contends that the personal use exemption "is specifically limited to the preparation or compounding of a controlled dangerous substance [ (CDS) ] already in existence." After examining the relevant statutory language, the trial court rejected defendant's broad interpretation. We concur.

"Manufacture" is defined as "the production, preparation, propagation, compounding, conversion or processing" of a CDS. *N.J.S.A.* 2C:35–2. The statute also states, however, that the definition "does not include the preparation or compounding of a[CDS] . . . by an individual for his own use." *Ibid.* Therefore, the Legislature limited the exemption to only two of the six enumerated activities, and an individual who engages in the production, propagation, conversion, or processing of a CDS—even for his own use—commits a proscribed activity.

In the present matter, we agree that defendant's actions did not fall within the narrow personal use exemption because he did not engage in "the preparation or compounding" of a CDS "for his own use." *Ibid.* Instead, defendant's actions exemplified the "production" of marijuana, which, by definition, includes "planting, cultivation, growing, or harvesting." *Ibid.*

Although no New Jersey court has previously considered whether there is a personal use defense to growing marijuana,[2] other jurisdictions have enacted nearly identical definitions of "manufacture" with "personal use" exemptions. *See, e.g., Ark.Code Ann.*

---

[2] Defendant claims that *State v. Kittrell,* 145 *N.J.* 112, 678 *A.2d* 209 (1996), supports his position. In that case, however, the defendant did not raise the personal use exemption, and the Court's analysis focused on the definition of manufacturing in relation to "[m]aintaining or operating a [CDS] production facility," *N.J.S.A.* 2C:34–4. *Id.* at 122, 678 *A.2d* 209.

§ 5–64–101(16)(A)–(C) (2011); *Mich. Comp. Laws Serv.* § 333.7106(2) (LexisNexis 2011); *Neb.Rev.Stat. Ann.* § 28–401(14) (LexisNexis 2011); *N.C. Gen.Stat.* § 90–87(15) (2011). Courts in these states have consistently determined that the plain language of their statutes limits the personal use exemption to preparation or compounding of a CDS. *See People v. Pearson,* 157 *Mich.App.* 68, 403 *N.W.*2d 498, 500, *appeal denied,* 428 *Mich.* 893 (Mich. 1987); *State v. Bossow,* 274 *Neb.* 836, 744 *N.W.*2d 43, 52 (2008). These courts have also recognized that the purpose behind the personal use exemption "is to avoid finding an individual liable for the . . . manufacturing [of] a [CDS] when that individual is already in possession of the controlled substance and is simply making it ready for use, such as rolling marijuana into cigarettes for smoking or combining it with other ingredients for use." *Bossow, supra,* 744 *N.W.*2d at 51–52; *see Stone v. State,* 348 *Ark.* 661, 74 *S.W.*3d 591, 594–95 (2002) (same) (citing *Owens v. State* 325 *Ark.* 110, 926 *S.W.*2d 650, 657–58 (1996)); *State v. Childers,* 41 *N.C.App.* 729, 255 *S.E.*2d 654, 656 (same), *cert. denied,* 298 *N.C.* 302, 259 *S.E.*2d 916 (1979); *see also Pearson, supra,* 403 *N.W.*2d at 500–01.

Similarly, we hold that the personal use defense for the preparation or compounding of a CDS does not apply to a charge of growing marijuana under *N.J.S.A.* 2C:35–5. *See State v. Ciancaglini,* 204 *N.J.* 597, 606, 10 *A.*3d 870 (2011) ("If the language of a statute is clear on its face, the sole function of the courts is to enforce it according to its terms.") (internal quotation marks omitted). As other courts have found, the purpose of the personal use exemption is to allocate culpability consistent with an individual's participation. Therefore, those who engage in "a significantly higher degree of activity" with a CDS, such as growing it, cannot avail themselves of the exemption. *Childers, supra,* 255 *S.E.*2d at 656. Moreover, this interpretation is consistent with New Jersey's stated policy "to distinguish between drug offenders based on the seriousness of the offense, considering principally the nature, quantity and purity of the [CDS] involved, and the role of the actor." *N.J.S.A.* 2C:35–1.1(c).

■ Because there is no personal use defense to growing marijuana, defendant's second point (that the trial court erred in barring his proposed expert witness) is clearly without merit. *R.* 2:11–3(e)(2). The trial court correctly concluded the proposed testimony, which would have been offered to establish the benefits of using marijuana to treat MS symptoms, was irrelevant.

In his third point, defendant argues that his sentence for manufacturing marijuana is manifestly excessive and should be reduced to "a period of probation." [3] Manufacturing marijuana plants in an amount greater than ten plants is a second-degree offense, *N.J.S.A.* 2C:35–5(b)(10)(b), and defendant was sentenced to five years, the minimum term of imprisonment for a second-degree offender, *N.J.S.A.* 2C:43–6(a)(2).

■ The presumption of imprisonment may be overcome if "having regard to the character and condition of the defendant, [the court] is of the opinion that [defendant's] imprisonment would be a serious injustice which overrides the need to deter such conduct by others." *N.J.S.A.* 2C:44–1(d). As a result, the Criminal Code leaves "a residuum of power in the sentencing court not to imprison in those few cases where it would be entirely inappropriate to do so." *State v. Roth,* 95 *N.J.* 334, 358, 471 *A.2d* 370 (1984) (internal quotation marks omitted). The Court has "consistently held that this residuum of power may be legitimately exercised in those 'truly extraordinary and unanticipated' cases where the 'human cost' of punishing a particular defendant to deter others from committing his offense would be 'too great.'" *State v. Evers,* 175 *N.J.* 355, 389, 815 *A.2d* 432 (2003) (quoting *State v. Rivera,* 124 *N.J.* 122, 125, 590 *A.2d* 238 (1991)).

■ When deciding whether the presumption has been overcome, "a trial court should determine whether there is clear and convincing evidence that there are relevant mitigating factors

---

[3] On appeal, defendant does not argue that he should have been sentenced as a third-degree offender for count two. *See N.J.S.A.* 2C:44–1(f)(2). Consequently, we will only consider whether defendant overcame the presumption of imprisonment as a second-degree offender.

present to an *extraordinary* degree and, if so, whether cumulatively, they so greatly exceed any aggravating factors that imprisonment would constitute a serious injustice overriding the need for deterrence." *Id.* at 393–94, 815 *A.*2d 432. It is the quality of the mitigating factors, not their quantity, that controls. *See id.* at 394, 815 *A.*2d 432 (stating that not "every mitigating factor will bear the same relevance in weight in assessing the character and condition of the defendant; it is the quality of the factor or factors and their uniqueness in the particular setting that matters"). In this case, the trial court found three aggravating factors (risk of recidivism, prior criminal record, and need to deter) and two mitigating factors (serious harm not contemplated, and conduct unlikely to recur), *N.J.S.A.* 2C:44–1(a) and (b), and it determined that the mitigating factors did not outweigh the aggravating.

In terms of the aggravating factors, defendant specifically contends that aggravating factor number nine, "[t]he need for deterring the defendant and others from violating the law," *N.J.S.A.* 2C:44–1(a)(9), is not supported by the record. At sentencing, the judge noted that defendant's adult criminal record included: the successful completion of a pretrial intervention program after he had been arrested and charged with three counts of burglary and two counts of criminal mischief; the entry of a final restraining order (FRO) that required defendant to surrender all weapons; charges of contempt and harassment in violation of the FRO; and a guilty plea to the harassment charge. The judge also observed: "Many people who suffer from MS and other chronic diseases do not use those diseases as a justification to break the law." We are satisfied that the trial court's findings are supported by substantial credible evidence. *See State v. O'Donnell,* 117 *N.J.* 210, 215, 564 *A.*2d 1202 (1989) ("An appellate court is bound to affirm a sentence, even if it would have arrived at a different result, as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record.").[4]

---

[4] Defendant further argues that the need to deter does "not exist in this case as a result of the recent enactment of the Compassionate Use Medical Marijuana

 Next, defendant claims that additional "mitigating factors should have been found by the trial court," and the quality of those factors would overcome the presumption. Most notably, defendant submits that his imprisonment "would entail excessive hardship." *N.J.S.A.* 2C:44–1(b)(11). The trial court rejected this factor, however, reasoning as follows: "Although you suffer from MS, which I find as a matter of fact, I do not find Mitigating Factor 11 applicable because ... there is nothing in the record to indicate that your medical needs could not be adequately met in prison."

In *State v. M.A.,* 402 *N.J.Super.* 353, 369, 954 *A.2d* 503 (App. Div.2008), we affirmed the trial court's determination that mitigating factor number eleven did not apply to a defendant with "AIDS, compounded by diabetes and coronary artery disease." Despite these medical conditions, we agreed that the defendant "was functioning at a reasonable level; he was undergoing active treatment; and there was nothing in the record indicating his needs could not be adequately met in prison." *Id.* at 372, 954 *A.2d* 503.

Furthermore, in *State v. Lebra,* 357 *N.J.Super.* 500, 510–11, 815 *A.2d* 1020 (App.Div.2003), we reversed the trial court's determination that the presumption of imprisonment had been overcome. In that case, "the trial court found as a mitigating factor that imprisonment would pose an excessive hardship to defendant" because he was diagnosed with a brain tumor between the time he was arrested and sentenced. *Id.* at 511, 815 *A.2d* 1020. Nevertheless, we concluded that defendant's medical needs could be "adequately met while [he was] incarcerated." *Ibid.*

Here, defendant's presentence report indicated "he was diagnosed with Multiple Sclerosis in 2002" and "is currently not taking any prescription medication because he has no medical insurance." Instead, defendant stated he was "treating his symptoms with Bee

---

Act," *N.J.S.A.* 24:6I–1 to –16. The Act, however, leaves untouched the criminal penalties for the unauthorized production of a CDS, and it has no bearing on the disposition of this appeal.

Venom Therapy" and "admitted to the daily use of marijuana to help alleviate his symptoms." Although we sympathize with defendant's medical condition, the record is devoid of any evidence that he will not obtain satisfactory medical treatment while incarcerated. As a result, we agree with the trial court's determination that there are no extraordinary mitigating factors in this case. *See State v. Jabbour,* 118 *N.J.* 1, 8, 570 *A.*2d 391 (1990) (noting that "[i]mprisonment generally results in hardship" and "[i]t is not enough ... that a defendant would find incarceration difficult").

There are a limited number of decisions in which the presumption of imprisonment has been overcome. *See State v. Jarbath,* 114 *N.J.* 394, 398, 555 *A.*2d 559 (1989) (presumption inappropriate for a mentally retarded and psychotic woman who pled guilty to the manslaughter of her infant child); *State v. E.R.,* 273 *N.J.Super.* 262, 272, 641 *A.*2d 1072 (App.Div.1994) (presumption inappropriate "based on the fact that defendant was suffering from HIV neuropathy, severe anemia, and leukopenia" and only had six months to live). The current matter is distinguishable from these cases, and we find no abuse of discretion or error of judgment by the trial court. *Roth, supra,* 95 *N.J.* at 363–64, 471 *A.*2d 370.

Affirmed.