**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4034-17T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JAMES WOETZEL,

    Defendant-Appellant.

_____

Argued March 10, 2020 – Decided April 28, 2020

Before Judges Yannotti, Hoffman and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 15-05-0385.

Margaret Ruth McLane, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Margaret Ruth McLane, of counsel and on the briefs).

Ali Y. Ozbek, Assistant Prosecutor, argued the cause for respondent (Camelia M. Valdes, Passaic County Prosecutor, attorney; Ali Y. Ozbek, of counsel and on the brief).

PER CURIAM

Defendant James Woetzel was tried before a jury and found guilty of first-degree vehicular homicide and other offenses, as charged in a Passaic County indictment. Defendant appeals from the judgment of conviction entered by the trial court. We affirm.

I.

On May 4, 2015, defendant was charged with first-degree vehicular homicide in violation of N.J.S.A. 2C:11-5(b)(3) (count one), for causing the death of Donna Wine while recklessly operating his vehicle while intoxicated within 1000 feet of a school; second-degree vehicular homicide for causing the death while operating his vehicle recklessly, but not intoxicated, in violation of N.J.S.A. 2C:11-5A (count two); second-degree leaving the scene of a motor vehicle accident resulting in death in violation of N.J.S.A. 2C:11-5.1 (count three); and first-degree aggravated manslaughter in violation of N.J.S.A. 2C:11-4(a) (count four).

The evidence presented at the suppression hearing and trial showed that on August 10, 2014, defendant drove his pickup truck through police barricades and into an open-air farmer's market in Hawthorne, injuring pedestrians, and causing the death of Donna Wine. When police arrived at the scene, defendant was mumbling, claimed he did not know what happened, and "blacked out"

before the accident. He was sweaty, experienced difficulty breathing, had a fast pulse, and was agitated. After being transported to the emergency room at St. Joseph's Regional Medical Center (St. Joseph's) for an evaluation, defendant eventually became mentally alert, oriented, and able to follow commands. Defendant could not recall anything about the accident. His urine screen tested negative for illicit drugs.

Detective David Ware from the Passaic County Prosecutor's Office visited defendant at St. Joseph's and asked for his consent to draw blood for a drug and alcohol analysis. Defendant readily agreed to the testing of his blood, insisting that there was "nothing" in it that related to the investigation. After being apprised of his right to refuse, defendant consented to the blood draw and signed a Hawthorne Police Department form that stated:

> I, James Woetzel, hereby authorize and consent to the taking of a sample of my blood and/or urine for an analysis to determine the presence of alcohol and/or controlled dangerous substances [(CDS)]. The blood will be extracted in a medically acceptable manner by a qualified professional. I understand that I have the absolute right to refuse to provide this sample(s).

Shortly after defendant's blood sample was taken, he was discharged and voluntarily accompanied Ware and another officer to the Passaic County

Prosecutor's Office to give a statement. After waiving his Miranda[1] rights, defendant gave a recorded interview that was played for the jury at trial. In the interview, defendant stated that a few hours before the subject accident, he went to Micro Center to purchase computer parts and "Dust-Off," an aerosol product used to clean dust from electronics. He also admitted he caused an accident a few years earlier in Fair Lawn when he similarly "blacked out" and explained, "the same [expletive] thing happened" that time as what happened earlier that day in Hawthorne.

On August 18, 2014, Hawthorne police delivered defendant's blood sample to the State Police laboratory for a toxicological analysis. Because of the similarities in the accidents, the Hawthorne police also requested that defendant's blood be tested for aerosol "huffing" substances. Pursuant to a search warrant executed on August 20, 2014, the police uncovered a Micro Center bag, a canister of Dust-Off on the passenger seat of defendant's pickup truck, and a receipt confirming he purchased Dust-Off at 1:21 p.m. on the day of the accident, less than an hour before losing consciousness. A similar scenario occurred relative to the 2012 collision.

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

Dust-Off contains difluoroethane (DFE). The canister found in defendant's truck was missing its safety tab and was more than a quarter empty. DFE can be an intoxicant if inhaled and cause brain impairment.

On August 22, 2014, police purchased two canisters of Dust-Off and sent them, along with the canister found in defendant's vehicle, to the Central Regional Laboratory of the New Jersey State Police Office of Forensic Sciences (OFS) for a comparative weight analysis. The Dust-Off canister retrieved from defendant's truck weighed 437.67 grams, which was about 158 grams less than the new canisters purchased.

Min Tang, a forensic analyst with the toxicology unit of the OFS, tested defendant's blood using a gas chromatography-mass spectrometry (GC-MS) machine. Defendant's blood tested negative for alcohol and CDS's, but positive for DFE. At the suppression hearing, Monica Tramontin, supervisor of the toxicology unit of the OFS and a scientist employed by the State Police laboratory for thirty years, testified about the laboratory procedures for testing blood for impairing substances, including DFE. She described DFE as an odorless, volatile compound used as an industrial refrigerant and a propellant in aerosol products, including Dust-Off. Tramontin testified that when inhaled,

DFE travels from the blood to the brain and can cause intoxication and impairment. After being ingested, DFE remains in the body only a few hours.

Tramontin also stated that in toxicological blood analyses in fatal cases, the state laboratory always tests the sample for drug content irrespective of the blood alcohol reading, whether law enforcement requests it or not. A blood sample is placed in the mass spectrometer to determine the molecular fingerprint of the detected gas. Tramontin further testified that the molecular fingerprint of DFE is unique and cannot be mistaken for any other substance. She also testified that DFE in the human body can cause depletion of oxygen, the hampering of motor functioning and hand-eye coordination, difficulty breathing, and loss of consciousness.

The State also presented testimony at the motion hearing from Dr. Robert Pandina, who was qualified as an expert in psychopharmacology. Pandina testified that after pressing the lever on the canister of Dust-Off, the substance would enter the lungs and "rapidly find [] its way to the blood supply . . . within seconds." He also stated that DFE remains in the blood for about four to five hours. Here, defendant's blood was drawn at 6:28 p.m., approximately four and one-half hours after the accident. According to Pandina, following the euphoria

resulting from inhaling DFE, a user may experience confusion, cognitive dysfunction, and difficulty with motor coordination.

Prior to trial, the trial judge denied defendant's motion to suppress the blood test results, information relating to the 2012 car accident, and defendant's prior purchases of Dust-Off. The judge determined that the initial extraction of defendant's blood and initial tests for alcohol and CDS were lawful, and the later testing of the blood for DFE was not a violation of the Fourth Amendment.

As to the prior accident, the judge found the evidence could be admitted at trial because it was intrinsic to the charged offenses. During the trial, the judge gave a limiting instruction to the jury that the evidence could only be considered to show an absence of mistake as to defendant's loss of consciousness. The judge also instructed the jury that the evidence could be considered in determining if defendant consciously disregarded a known risk and showed extreme indifference to human life when he operated his truck on the date of the subject accident.

The jury found defendant guilty of vehicular homicide and aggravated manslaughter. On December 1, 2017, the trial judge merged count two into count one and sentenced defendant to twenty-years imprisonment, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant also received a

concurrent twenty-year term of incarceration subject to NERA on count four, aggravated manslaughter. The judge ordered defendant to pay $12,750 in restitution, in addition to statutory fines and penalties.

Defendant presents the following arguments on appeal:

POINT ONE

THE BLOOD-TEST RESULTS MUST BE SUPPRESSED BECAUSE TESTING DEFENDANT'S BLOOD FOR A CHEMICAL THAT IS NOT A [CDS] EXCEEDED THE SCOPE OF HIS CONSENT.

POINT II

EVIDENCE OF A PRIOR CAR ACCIDENT ALLEGEDLY CAUSED BY DEFENDANT'S INTOXICATION WAS INADMISSIBLE. THE STATE COULD NOT PROVE THE CAUSE OF THE PRIOR ACCIDENT, AND EVEN IF [IT] COULD, ITS ADMISSION WAS SO UNDULY PREJUDICIAL THAT IT TAINTED DEFENDANT'S ENTIRE TRIAL.

POINT III

THE STATE'S TWO EXPERT WITNESSES [MS. TRAMONTIN AND DR. PANDINA] WERE NOT QUALIFIED TO TESTIFY ABOUT [DFE], AND THEIR TESTIMONY SHOULD HAVE BEEN EXCLUDED UNDER [RULES] 702 AND 703.

POINT IV

THE DEFENDANT'S SENTENCE OF TWENTY YEARS WITH AN [EIGHTY-FIVE PERCENT]

PAROLE DISQUALIFIER IS MANIFESTLY EXCESSIVE.

## II.

We will begin our review with defendant's argument that his blood test results were erroneously admitted into evidence. He contends that while he consented to a search of his blood for alcohol or CDS's, the police exceeded the scope of his consent by further searching his blood for aerosol "huffing" substances, such as DFE.

The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution preserve "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV; accord N.J. Const. art. I, ¶ 7. "[A] blood test is an 'intrusion[ ] into the human body' and therefore constitutes a search and seizure within the meaning of the Fourth Amendment." State v. Zalcberg, 232 N.J. 335, 346 (2018) (second alteration in original) (quoting Schmerber v. California, 384 U.S. 757, 767 (1966)).

While a search pursuant to a warrant is presumptively valid, State v. Robinson, 200 N.J. 1, 7 (2009), a warrantless search is presumed invalid "unless one of the few 'well-delineated exceptions to the warrant requirement' applies." Zalcberg, 232 N.J. at 345 (quoting State v. Gonzales, 227 N.J. 77, 90 (2016)).

9

One of these exceptions is the consent doctrine. State v. Hagans, 233 N.J. 30, 39 (2018).

"[U]nder Article I, paragraph 7 of the New Jersey Constitution any consent given by an individual to a police officer to conduct a warrantless search must be given knowingly and voluntarily." State v. Carty, 170 N.J. 632, 639 (2002), modified, 174 N.J. 351 (2002). "To be voluntary the consent must be 'unequivocal and specific' and 'freely and intelligently given.'" State v. King, 44 N.J. 346, 352 (1965) (citation omitted); accord State v. Shaw, 237 N.J. at 619 (citing Hagans, 233 N.J. at 41-42).

"The burden is on the State to show that the individual giving consent knew that he or she 'had a choice in the matter.'" Carty, 170 N.J. at 639 (quoting State v. Johnson, 68 N.J. 349, 354 (1975)). "The ultimate determination must rest on the facts of each individual case . . . [a]nd a court's determination must be based on the totality of the circumstances and be supported by sufficient credible evidence in the record." Shaw, 237 N.J. at 619 (quoting Hagans, 233 N.J. 30 (2018)).

"[W]hen police rely on a consent to search, the search that may be conducted pursuant thereto is limited by the scope, whether express or implied, of the consent." State v. Younger, 305 N.J. Super. 250, 256 (App. Div. 1997).

A-4034-17T4

"The scope of a search extends to what is objectively reasonable, which is defined as what 'the typical reasonable person [would] have understood' the scope to include." State v. Hampton, 333 N.J. Super. 19, 29 (App. Div. 2000) (alteration in original) (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)).

We reject defendant's argument because viewed in the context of the circumstances presented, an objectively reasonable person would have understood the scope of defendant's consent to include the State's chemical testing for DFE.

Here, during the interview, Ware told defendant the police were investigating the cause of the accident and that the "most important pieces of the puzzle" were what happened during the collision itself, when defendant claimed to have "blacked out." Defendant insisted he did not remember what had happened, offered to have "someone . . . put me under," and volunteered that he was in a prior accident after having blacked out.

When Ware asked if he had seen a doctor about the prior blackout, defendant offered, unsolicited, "[t]est my blood, there's nothing in my blood." (Emphasis added). Later defendant said to Ware, "maybe something happened to--to me or I was on drugs or something," and then once again brought up the

subject of analyzing his blood, asking, "[d]id you get my blood? You'll see it's nothing wrong with my blood. So why--why else would I do that?"

As the motion judge aptly recognized, "[t]he word nothing is commonly understood to be an all-encompassing denial," and because defendant "insisted there would not be anything incriminating in his blood and thus encouraged it to be tested . . . implicit in this global denial [was] the assumption by the speaker that everything reasonably within the scope of investigation will be tested for." Moreover, the search for DFE was within the scope of the investigation because police were investigating possible causes of this fatal accident and DFE, an intoxicating substance, could be evidence of intoxication, if detected.

Therefore, as noted by the motion judge, because DFE was "a substance capable of causing a condition of intoxication, inebriation, stupefaction or the dulling of the brain or nervous system" testing defendant's blood for the substance "was justified and proper in investigating the cause of the August 10, 2014 motor vehicle accident." We agree.

"[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Elders, 192 N.J. 224, 243 (2007) (internal quotation marks and citations omitted). "An

appellate court should not disturb the trial court's findings merely because 'it might have reached a different conclusion were it the trial tribunal' or because 'the trial court decided all evidence or inference conflicts in favor of one side' in a close case." Id. at 244 (quoting State v. Johnson, 42 N.J. 146, 162 (1964)).

Rather, "[a] trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" Ibid. (quoting Johnson, 42 N.J. at 162). Appellate courts "owe no deference, however, to conclusions of law made by trial courts in suppression decisions," which are reviewed de novo. State v. Sencion, 454 N.J. Super. 25, 31-32 (App. Div. 2018) (citing State v. Watts, 223 N.J. 503, 516 (2015)).

Defendant further contends that his consent was limited to a search for alcohol or CDS's in his blood and DFE is not a CDS as defined in N.J.S.A. 2C:35-2 and scheduled in N.J.S.A. 24:21-5 to -8.1. His argument is devoid of merit.

We are guided by the Court's holding in A.A. ex rel. B.A. v. Attorney General, 189 N.J. 128 (2007), pertaining to the permissible use of DNA evidence. In that case, the defendant challenged the constitutionality of the DNA Database and Databank Act of 1994 (The DNA Act), N.J.S.A. 53:1-20.17 to -20.28, by contending that it was an unconstitutional search to analyze DNA

samples "to solve crimes committed before the tests were performed . . . ." A.A., 189 N.J. at 138. The Court disagreed, holding that "once a search and seizure is completed, the subsequent use of the evidence does not constitute an independent search because there is no additional invasion of the owner's privacy interest." Id. at 139. [I]f "the initial search [was] lawful, the subsequent use of the evidence seized is not a search that implicates the Fourth Amendment." Ibid.

Defendant relies principally on two cases in support of his claim that analyzing his lawfully seized blood for evidence of DFE was an unconstitutional search, arguing that police cannot ask to look for one thing, and then instead conduct a much broader general search.

In State v. Leslie, 338 N.J. Super. 269, 272 (App. Div. 2001), following a motor vehicle stop, an officer asked the defendant driver for consent to "look inside the passenger's compartment" for his driving credentials, which he had been unable to produce upon request. We concluded that the subsequent search of the trunk was a broader search than the officer had described and, because it exceeded the scope of his consent, it was illegal. Id. at 275.

In Younger, we held that the police, while lawfully executing a consent search for a firearm, unlawfully "exceeded the scope of the authority conferred

. . . by the consent" by opening a three-by-two-inch change purse that "obviously could not have contained a gun and . . . anything sharp or hard that might have been inside it could have been felt without opening it . . . ." 305 N.J. Super. at 253-54.

Leslie and Younger are clearly distinguished because in both cases, lawfully, authorized consent searches unlawfully extended to areas beyond the scope of the authorization granted. And, the challenged portion of the searches vitiated the voluntariness of the consent granted because separate privacy interests were invaded.

In this case, however, the State's GC-MS test for DFE was a toxicological blood analysis in furtherance of the vehicular homicide investigation, which, in contrast to Leslie or Younger, was the same stated purpose for which the consent search was initially authorized. Accordingly, these cases do not support defendant's claim that the State's DFE analysis of his lawfully obtained blood sample was an unconstitutional search.

Defendant also relies on two cases from decisions in other jurisdictions in support of his contention that the testing here violated the Fourth Amendment: State v. Gerace, 437 S.E.2d 862 (Ga. Ct. App. 1993), and State v. Binner, 886 P.2d 1056 (Or. Ct. App. 1994). When interpreting the Federal Constitution, our

courts are not bound by other jurisdictions, but only by decisions of the Supreme Court of the United States and our own precedents.  State v. Witczak, 421 N.J. Super. 180, 194-95 (App. Div. 2011).

We conclude both cases are distinguishable from the matter under review. In Gerace, the defendant had consented to a blood draw following a motor vehicle accident in the State's investigation for a driving while intoxicated charge.  437 S.E.2d at 862-63.  Unlike this case, the blood evidence obtained in Gerace was used solely to obtain DNA to prosecute the defendant for an earlier offense that had no connection to the accident under investigation.  Ibid.

Binner is also distinguishable factually and legally.  The defendant in Binner, while agreeing to allow his blood to be tested for alcohol, "expressly refused to consent to a test of his urine for drugs."  886 P.2d at 1059.  The limited consent in Binner is distinguishable from defendant's broad invitations here for the police to search his blood because he was confident there was "nothing" in it to explain his lapse of consciousness.  As to legal interpretation, the Oregon court's holding was not premised on the Fourth Amendment, but on its analysis of the defendant's privacy interests under the Oregon Constitution.  Therefore, we are unpersuaded by the legal authorities presented by defendant.

Here, there is no question that the initial extraction of defendant's blood and the subsequent blood-alcohol analysis were lawful pursuant to defendant's knowing and voluntary consent. Therefore, the second toxicological analysis of the lawfully seized blood was not a Fourth Amendment search because no "additional invasion" of defendant's privacy was involved. Ibid. Although DFE is not a scheduled CDS under N.J.S.A. 2C:35-2, the compound, when inhaled, can cause intoxication, which could have subjected defendant to liability for driving while intoxicated under N.J.S.A. 39:4-50(a)(3) regardless of whether DFE was scheduled. See State v. Federico, 414 N.J. Super. 321, 326-27 (App. Div. 2010) (citation omitted) ("DWI is an absolute liability offense and intoxication on chemicals or otherwise is not a defense.").

The record clearly shows defendant knew the police were investigating D.W.'s death as a vehicular homicide and that he consented to having his blood searched for evidence of drugs or alcohol. The fact that DFE is not a scheduled substance is immaterial, because the language used in the consent form does not define the parameters of the authorization granted, which is instead determined by the objective circumstances. Leslie, 338 N.J. Super. at 275 (holding in consent search of automobile following a roadside detention, that "general

language of the consent document" did not determine scope of consent when that language was inconsistent with officer's "oral representation[.]").

We are convinced that analyzing defendant's blood for "huffing" substances and DFE fits the definition of what a "typical reasonable person [would] have understood the scope" of his consent to a blood draw to include. Hampton, 333 N.J. Super. at 29 (alteration in original) (internal quotations and citation omitted). Thus, we find no error in the admission of defendant's blood test results relative to DFE, and the judge correctly denied his motion to suppress this evidence.

## III.

Next, defendant argues that evidence of his earlier motor vehicle accident and his frequent purchases of Dust-Off over the course of a twenty-five-month period was erroneously admitted into evidence. Defendant argues that the evidence was not relevant for any non-propensity purpose and was prejudicial under Rule 404(b). We disagree.

Before trial, the judge ruled that the evidence pertaining to the 2012 accident and the fifteen Dust-Off purchases defendant made between July 2012 and August 2014 were admissible as both intrinsic to the charged conduct and

as a prior bad act under Rule 404(b), finding the evidence was probative of absence of mistake.

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. State v. Rose, 206 N.J. 141, 157 (2011) (citing Brenman v. Demello, 191 N.J. 18, 31 (2007)). Our review is de novo, however, if the court applied the wrong test or failed to perform the required analysis. State v. Garrison, 228 N.J. 182, 194 (2017) (citing Rose, 206 N.J. at 158).

Relevant evidence is presumptively admissible under Rule 402, but may be found inadmissible under Rule 403 "if its probative value is substantially outweighed by the risk of . . . undue prejudice[.]" Moreover, Rule 404(b) states that,

> evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.
>
> [N.J.R.E. 404(b).]

"The threshold determination . . . is whether the evidence relates to 'other crimes,' and thus is subject to . . . analysis under Rule 404(b), or whether it is evidence intrinsic to the charged crime, and thus need only satisfy the evidence

rules relating to relevancy, most importantly Rule 403." Rose, 206 N.J. at 179. "[T]he notion of 'intrinsic evidence' lies in the cross hairs of the intersection of Evidence Rules 401, 402, and 403, on the one hand, and Rule 404 (b) on the other." Id. at 177. While evidence of "other crimes, wrongs, or acts," is analyzed under, and subject to the strictures of Rule 404(b), "evidence that is intrinsic to a charged crime need only satisfy the evidence rules relating to relevancy, most importantly the Rule 403 balancing test." Id. at 177-78. To determine if evidence "is intrinsic to the charged crime," the Court in Rose adopted a test enunciated in United States v. Green, 617 F.3d 233 (3d Cir. 2010). Rose, 206 N.J. at 180.

The Court held that "two narrow categories of evidence" of other bad acts are intrinsic to the charged crime: (1) evidence that "'directly proves' the charged" crime; and (2) evidence of bad "acts performed contemporaneously with the charged crime" that "facilitate[d] the commission of the charged crime." Ibid. (internal quotation marks omitted) (quoting Green, 617 F.3d at 248-49). Any evidence of other bad acts not fitting within one of those two "tight description[s] of intrinsic evidence" must be analyzed under Rule 404(b). Id. at 181.

The judge found that the evidence regarding the July 2012 accident and fifteen Dust-Off purchases made between July 2012 and August 2014 were intrinsic because the evidence was "intertwined with the fabric of this case," and omitting the same would "remov[e] . . . the proper context of the incident." Moreover, the judge ruled the evidence made it "more probable that the [d]efendant's conduct was reckless" and "more probable that the [d]efendant consciously disregarded a known risk" by operating his truck under the influence of DFE.

Pursuant to Rule 404(b), evidence of other crimes or bad acts is generally not admissible, unless used for "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute." In Cofield, our Supreme Court set forth a four-pronged test to govern the admission of such evidence:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.

21

> [State v. Cofield, 127 N.J. 328, 338 (1992) (citation omitted); see also State v. Carlucci, 217 N.J. 129, 140-41 (2014) (reaffirming the Cofield test).]

The Court also explained that the second Cofield prong is not one that can be found in the language of Rule 404(b).

Here, the judge held that prong one was satisfied for similar reasons that supported the finding that the evidence was intrinsic. The evidence was probative of defendant's mental state of mind at the time of the offense, a mental state consistent with mistake. Because defendant lost consciousness in 2012 while ostensibly under the influence of DFE, the judge found he was on notice of the potential adverse consequences of inhaling that substance while driving. And, defendant's failure to heed that warning tended to negate the possibility that he became intoxicated on DFE by mistake or accident.

Relying on State v. Williams, 190 N.J. 114, 131-34 (2007), the judge declined to consider the second Cofield prong, finding it was not "analogous to the proposed uses of 404(b) evidence in Cofield itself." Defendant has not challenged the judge's decision on prong two. Therefore, any challenge to the findings regarding prong two is waived. See State v. Amboy Nat'l Bank, 447 N.J. Super. 142, 148 n.1 (App. Div. 2016).

Under prong three of Cofield, the State bears the burden of proving the prior crime, wrong, or bad act by "clear and convincing evidence." Aiello v. Knoll Golf Club, 64 N.J. Super. 156, 162 (App. Div. 1960); accord State v. Hernandez, 170 N.J. 106, 127 (2001). "The clear and convincing standard may be satisfied by uncorroborated testimonial evidence." Hernandez, 170 N.J. at 127 (quoting In re Samay, 166 N.J. 25, 30 (2001)).

Here, in finding the State met its burden, the judge referenced defendant's recorded statement to police that he had previously blacked out while driving in 2012, and the investigating officers' accounts of the accident. The judge also relied upon records from Micro Center to establish that defendant bought Dust-Off more than a dozen times in twenty-five months, including within an hour of both motor vehicle collisions.

Defendant contends the State did not present clear and convincing evidence that the prior accident was caused by his inhalation of Dust-Off. Defendant bases this argument in part on the fact that no motor vehicle tickets were issued following the 2012 accident and that the responding officer testified that defendant had not exhibited signs of intoxication.

However, defendant himself admitted to having lost consciousness before the earlier collision and it was reasonable to reject his explanation for that loss

of consciousness as having been caused by the other driver's high-beam headlights. Not only did the other driver deny this, but defendant had purchased Dust-Off only eleven minutes before he crashed into a ramp and hit the other vehicle head-on. Based on these facts and the expert testimony concerning the effects of inhaling DFE, the court had ample record support to reach "a firm belief or conviction," Aiello, 64 N.J. Super. at 162, that defendant inhaled Dust-Off on July 24, 2012, which caused him to lose consciousness and crash. The judge correctly determined that the third Cofield prong was met.

Under the fourth Cofield prong, "[t]he probative value of the evidence must not be outweighed by its apparent prejudice." Cofield, 127 N.J. at 338. "That prong requires an inquiry distinct from the familiar balancing required under [Rule] 403: the trial court must determine only whether the probative value of such evidence is outweighed by its potential for undue prejudice . . . not whether it is substantially outweighed by that potential . . . ." State v. Green, 236 N.J. 71, 83-84 (2018) (internal citation omitted).

In Green, a vehicular homicide prosecution, the Court held that the defendant's previous DWI[2] convictions were probative as to whether he "was aware of, but consciously disregarded, the risks of driving while intoxicated, a

---

[2] Driving while intoxicated.

mental state that is a material element of vehicular homicide." Id. at 85. However, the probative value of the prior convictions was diminished by the fact that they had occurred five and sixteen years before the offense for which the defendant was charged, and the State possessed the less inflammatory proof of defendant's blood-alcohol reading at the time of the charged conduct. Id. at 85-86.

Moreover, the Court held, it was reasonable for the motion judge to conclude that the risk of prejudice was high because the prior convictions might confuse or mislead the jury, "causing it to convict [the defendant] based solely on his propensity to drive while intoxicated." Id. at 85. Therefore, the Green Court concluded that under those circumstances, the balancing of "the probative value against the prejudice of admitting [the evidence] . . . favor[ed] the exclusion of the evidence." Id. at 86.

Here, in finding prong four was met, the judge appropriately relied on the lack of alternative theories as to the cause of the subject accident and on the limiting instructions, which alleviated the risk of undue prejudice.

Defendant argues that evidence of the 2012 accident and the Dust-Off purchases were prejudicial for one of the same reasons as in Green—that there was less prejudicial evidence available to prove his heightened awareness of the

risks of inhaling an intoxicant, including the presence of DFE in defendant's blood. In defendant's view, admitting the "prior bad acts" evidence "unfairly paint[ed] [defendant] as the kind of person who got high and drove," which was what Rule 404(b) was designed to prevent.

Green is distinguishable from this case in several respects. First, although the defendant in Green was charged with vehicular homicide, he was not charged with aggravated manslaughter, "which requires proof of a higher level of recklessness than does vehicular homicide." Id. at 80. Therefore, defendant's knowledge that a loss of consciousness could result from inhaling DFE from an aerosol canister was relevant to determining whether his actions "manifest[ed] extreme indifference to the value of human life." N.J.S.A. 2C:11-4(a)(1). Even if the jury believed DFE inhalation was the cause of defendant's loss of consciousness, absent evidence of the 2012 accident and the prior Dust-Off purchases, it would have had to speculate as to whether he was aware of these risks.

Second, in Green, the more recent of the two DWI convictions occurred more than five years before the charged conduct and the most remote one was sixteen years earlier. Id. at 78. By contrast in this matter, the prior collision and Dust-Off purchases all occurred no more than twenty-five months before

the charged conduct, making these "prior bad acts" less remote and more probative than those in <u>Green</u>. <u>See</u> <u>State v. Marrero</u>, 148 N.J. 469, 491 (1997) ("The temporal remoteness of other-crime evidence affects both its probative worth and prejudicial effect on a defendant.").

Finally, defendant, the only witness to both accidents, introduced the 2012 collision into the case himself when he told police in a recorded statement that the "same [expletive] thing" had happened to him each time.

Because the judge's findings are supported by sufficient credible evidence in the record, we conclude the judge's decision to admit evidence concerning defendant's 2012 accident and Dust-Off purchases between 2012 and 2014 was not a mistaken exercise of discretion.

Once evidence is found to be admissible, "the court must instruct the jury on the limited use of the evidence." <u>Cofield</u>, 127 N.J. at 340-41. "[T]he court's instruction 'should be formulated carefully to explain precisely the permitted and prohibited purposes of the evidence, with sufficient reference to the factual context of the case to enable the jury to comprehend and appreciate the fine distinction to which it is required to adhere.'" <u>Id.</u> at 341 (quoting <u>State v. Stevens</u>, 115 N.J. 289, 304 (1989)).

A-4034-17T4

Here, the judge properly instructed the jury it could use the 2012 collision and the Dust-Off purchases not to show "a disposition or tendency to do wrong," but for the non-propensity purpose of proving absence of mistake as to defendant's loss of consciousness, and to show that he consciously disregarded a known risk and manifested extreme indifference to the value of human life. Viewed in context, the evidence was probative in explaining the subject accident.

With regard to both accidents, defendant purchased a canister of Dust-Off less than an hour before, and in his words, he blacked out and crashed his vehicle each time. Based upon the expert testimony that DFE can cause loss of consciousness if inhaled, the jury reasonably inferred that in both instances, defendant blacked out while driving after purchasing and inhaling Dust-Off from the intoxicating effects of DFE.

As to defendant's other Dust-Off purchases—the thirteen not associated with a known motor vehicle accident—there was expert testimony about the ways in which inhalants could be used to produce intoxicating effects. The jury could have reasonably inferred from the number of purchases that defendant had a habit of using inhalants for their euphoria-inducing and intoxicating effects.

As to potential prejudice under Rule 403, the judge three times instructed the jury not to "use this evidence to decide that the defendant has a tendency to commit crimes or that he is a bad person" or that "he has a disposition or tendency to do wrong." The jury was only to consider the purchase history as probative of absence of mistake or to show defendant was aware of and consciously disregarded the risks of driving while intoxicated. We agree with the judge's analysis.

"Jurors are presumed to have followed the court's instructions in the absence of evidence demonstrating otherwise." State v. Montgomery, 427 N.J. Super. 403, 410 (App. Div. 2012). There is nothing in the record to suggest that the jury did not understand the judge's instructions. Accordingly, we see no abuse of discretion in the judge's decision to admit evidence of defendant's 2012 accident and Dust-Off purchases into evidence.

IV.

Defendant next contends that Pandina and Tramontin, who testified about the effects of DFE on the human body, gave inadmissible expert testimony under Rules 702 and 703. He further asserts that these experts provided inadmissible net opinion testimony.

A witness may testify as an expert if "qualified . . . by knowledge, skill,

experience, training, or education" to offer the opinion as long as the expert's "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . . ."  N.J.R.E. 702

Under Rule 703, an expert opinion must be based on "facts or data." N.J.R.E. 703.  "The corollary of that rule is the net opinion rule, which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data."  State v. Townsend, 186 N.J. 473, 494 (2006). However, the net opinion rule "does not require experts to organize or support their opinions in a specific manner 'that opposing counsel deems preferable.'" In re Civil Commitment of A.Y., 458 N.J. Super. 147, 169 (App. Div.) (quoting Townsend, 221 N.J. at 54), cert. denied, 238 N.J. 436 (2019).

A.    Tramontin's expert testimony

In a pretrial hearing, Tramontin, a forensic scientist and supervisor of the toxicology unit at the Central Regional Laboratory of the OFS, was admitted, over defendant's objection, as an expert in DFE and the laboratory procedures used to detect DFE in the bloodstream.

At a later pretrial hearing before a different judge, defendant again objected to Tramontin's proposed testimony, partially on the grounds that she was unqualified to testify about the side effects of DFE.  The judge overruled

the objection and admitted Tramontin as an expert in the field of forensic toxicology, partially based in part on the ruling by the motion judge.

To be admissible, expert testimony must satisfy three requirements.  It "must concern a subject matter that is beyond the ken of the average juror; . . . the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and . . . the witness must have sufficient expertise."  State v. Stubblefield, 450 N.J. Super. 337, 343 (App. Div. 2017) (quoting Agha v. Feiner, 198 N.J. 50, 62 (2009)).  "Concerning expertise, an expert witness must possess the minimal technical training and knowledge essential to the expression of a meaningful and reliable opinion."  State v. Frost, 242 N.J. Super. 601, 615 (App. Div. 1990).

A lack of formal clinical training in a given area will not necessarily disqualify the expert from testifying if there is some other foundation for the expert's opinion.  State v. Jenewicz, 193 N.J. 440, 455-56 (2008) (holding it was error to exclude drug treatment counselor's testimony regarding "behavioral and mental irregularities of long-term cocaine abusers" despite counselor's lack of formal licensing or clinical training).

Defendant asserts that Tramontin lacked expertise on which to base her opinions concerning the effects of DFE on humans, because she had no relevant

educational experience, clinical training, or certifications apart from her bachelor's degree in chemistry. He contends that her work in analyzing blood and urine samples qualified her to testify only about laboratory procedures for such analyses and not about the side effects of specific drugs or chemicals. We reject defendant's argument.

"The qualifications of an expert and the admissibility of opinion or similar expert testimony are matters left to the discretion of the trial court." State v. McGuire, 419 N.J. Super. 88, 123 (App. Div. 2011). Particularly regarding "an individual's expertise to speak on a topic as an expert witness," our Supreme Court has afforded "substantial deference to the trial court when it determines whether to qualify a proposed expert." Jenewicz, 193 N.J. at 454-55. "[T]he strength of an individual's qualifications may be undermined through cross-examination," and should not be used "as a reason to exclude a party's choice of expert witness to advance a claim or defense." Id. at 455. The court's decision to qualify an expert "will only be reversed for 'manifest error and injustice.'" Ibid. (quoting State v. Torres, 183 N.J. 554, 572 (2005)).

In addition to Tramontin's thirty years' experience analyzing blood and urine "for impairing substances" capable of affecting someone's "mental capacity," and her qualification as an expert in a previous case involving DFE,

she also audited the State Police training for drug recognition experts (DRE), a course specifically designed to teach "how to identify if someone is impaired and what they're impaired by." Tramontin also testified she had reviewed publications concerning DFE inhalation and was aware that its potential health effects, included unconsciousness.

Given her extensive experience in the toxicology unit, her completion of DRE training, and her review of literature about DFE, Tramontin "possess[ed] the minimal technical training and knowledge essential to the expression of a meaningful and reliable opinion" regarding the effects of that substance on the human body. Frost, 242 N.J. Super. at 615. Moreover, to the extent she lacked formal clinical training, that did not disqualify her from testifying as an expert, Jenewicz, 193 N.J. at 455-56, but went only to the weight of her testimony, which the defendant was able to and did challenge on cross-examination.

The jury was made aware that Tramontin had not taken formal classes on the effects of DFE and was free to consider that fact during its deliberations. The judge gave the model instruction on expert witnesses, which provides that the jury was not bound to accept expert opinions and was free to determine from the evidence whether the facts forming the foundation for the opinions were true. We conclude that the judge did not commit a manifest error or injustice by

permitting Tramontin to testify about the effects of DFE in the human body.

B.     Pandina's expert testimony

Defendant also contends that Pandina lacked the expertise to testify about the effects of DFE. Pandina's area of expertise, defendant argues, was on the effect of alcohol and drugs on human behavior, and his opinion as to the effects of inhaling DFE was an area beyond his expertise and was not grounded in sufficient facts or data to support his opinion. Again, we disagree.

Pandina testified about his extensive expertise in the areas of psychopharmacology and substance abuse. He was a professor at Rutgers University for forty-four years in the graduate department for neurosciences and applied professional psychology. He also served as an adjunct professor in the department of psychiatry at Robert Wood Johnson Medical School.

In his qualifying testimony, Pandina testified he was familiar with a dozen different types of inhalants, including DFE, which are used to produce euphoric effects similar to anesthesia. After the judge qualified Pandina as an expert in the field of psychopharmacology, he testified before the jury that DFE is a highly toxic substance for which users are unlikely to develop a tolerance.

After reviewing the police reports and medical records in this case, Pandina opined that defendant ingested DFE a few minutes before the subject

accident. "According to Pandina, when defendant drove through the farmer's market, he was under the influence of DFE and 'operating on automatic pilot.'" Viewing Pandina's testimony in the context of the facts of this case, we see no reversible error or abuse of discretion by the judge.

V.

Lastly, defendant challenges his sentence. He argues that a sentence of twenty-years imprisonment, with an eighty-five percent period of parole ineligibility, is manifestly excessive and unreasonable.

"Appellate review of sentencing decisions is relatively narrow and is governed by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010) (citing State v. Jarbath, 114 N.J. 394, 401 (1989)). On appeal, we may "not substitute [our] judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014) (citing State v. O'Donnell, 117 N.J. 210, 215 (1989)). We

> must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Here, the judge found aggravating factor two, N.J.S.A. 2C:44-1(a)(2) (the gravity and seriousness of harm inflicted on the victim), aggravating factor three, N.J.S.A. 2C:44-1(a)(3) (the risk that defendant will commit another offense), and aggravating factor nine, N.J.S.A. 2C:44-1(a)(9) (the need for deterring the defendant and others from violating the law). The judge only found one mitigating factor, seven, N.J.S.A. 2C:44-1(b)(7) (defendant had no prior criminal history).

Defendant does not argue his sentence shocked the judicial conscience, but claims that the judge erred in three respects: (1) aggravating factor three was improperly based on punishing defendant for his prior bad acts and his addiction rather than for the offense for which he was sentenced; (2) aggravating factor nine was unsupported by the record; and (3) mitigating factors seven, eight, nine, and eleven were not given the appropriate weight they were due. Defendant also argues that the court ordered restitution without first determining his ability to pay.

We disagree. The record shows defendant was convicted in 2002 of driving while intoxicated. The presentence investigation report also reflected that apart from his misuse of inhalants, defendant had a history of cocaine,

marijuana, and alcohol use. Therefore, aggravating factor three was supported by "competent, reasonably credible evidence." Roth, 95 N.J. at 363.

In finding aggravating factor nine applied, the judge determined that defendant had not "learned his lesson" from his prior DWI conviction and that "[t]his sentence needs to deter him when he is released from prison."

As to general deterrence, the judge noted that a lengthy sentence would be appropriate to deter others from driving under the influence. The judge added, "[t]he word to the public is you want to go out and you want to indulge in anything to get high—just do it home . . . Because if you do it in public and something like this happens, you better be prepared to face some real serious consequences."

Here, the judge found only one mitigating factor, seven, which pertains to defendant's lack of criminal history. N.J.S.A. 2C:44-1(b)(8) and (9). The judge declined to find factors eight and nine—that "defendant's conduct was the result of circumstances unlikely to recur" and that "[t]he character and attitude of the defendant indicate that he is unlikely to commit another offense," respectively. N.J.S.A. 2C:44-1(b)(8-9). In rejecting these factors, the judge rightfully noted there was no evidence defendant was in a serious rehabilitative program. The judge also rejected mitigating factor eleven—that "imprisonment of the

defendant would entail excessive hardship"—finding that defendant suffered no hardship while incarcerated in jail because imprisonment was beneficial to his health. N.J.S.A. 2C:44-1(b)(11).

Defendant first argues that mitigating factor seven warranted "substantially more weight because this was [defendant's] first indictable arrest and conviction." He contends that the judge erred by finding both aggravating factor three and mitigating factor seven without offering "a reasoned explanation for its conclusion that this first-time offender presented a risk to commit another offense." State v. Case, 220 N.J. 49, 67 (2014). We disagree.

The judge gave ample reasons that supported aggravating factor three and diminished the weight of mitigating factor seven. The relative weight given to each of those factors was within the trial court's discretion. See State v. Dalziel, 182 N.J. 494, 504-05 (2005) (noting that mitigating factors supported by the record "may be accorded such weight as the judge determines is appropriate").

Next, with respect to mitigating factor eight—that conduct was the result of circumstances unlikely to recur—defendant argues that because he was fifty-two years old at the time of sentencing and the court had issued a twenty-year license suspension, it was "extremely unlikely that [he] will ever drive again once he is released from prison." Defendant has twice been convicted of DWI,

apart from a third time, in Fair Lawn in 2012, wherein he also appears to have driven while intoxicated. Because the 2012 accident did not deter defendant, the judge was justified in declining to find the circumstances here were "unlikely to recur." N.J.S.A. 2C:44-1(b)(8).

Concerning mitigating factor nine, defendant's character and attitude, N.J.S.A. 2C:44-1(b)(9), defendant contends he was regarded as "a loving family member who cared for both of his parents in their old age," that he had "helped his friends, treated his employees well," and that he was "working to improve himself while he was in jail." The judge expressly considered these facts, but found that defendant's decision to inhale DFE while driving on August 10, 2014, "just wipes out everything he has done professionally and personally."

Moreover, the judge noted that the homicide occurred within three blocks of defendant's home, commenting "[i]t would've only taken, about, five more minutes" to return home before becoming intoxicated and that his failure to wait was "[t]he height of selfishness". The judge's weighing of mitigating factor nine was well within his "wide discretion." State v. Clarke, 203 N.J. 166, 177 (2010).

With respect to mitigating factor eleven, whether imprisonment "would entail excessive hardship" to defendant, N.J.S.A. 2C:44-1(b)(11), defendant

noted that he has diabetes and "significant hip problems," and argued these ailments will pose a significant hardship as he advances in age.

In State v. Wilson, 421 N.J. Super. 301, 311-12 (App. Div. 2011), we rejected a similar argument from a defendant suffering from multiple sclerosis, holding that "[a]lthough we sympathize with defendant's medical condition, the record is devoid of any evidence that he will not obtain satisfactory medical treatment while incarcerated." Here, similarly, no evidence showed that defendant will be unable to obtain treatment for his medical conditions while incarcerated. See also State v. M.A., 402 N.J. Super. 353, 369 (App. Div. 2008) (affirming trial court's rejection of mitigating factor eleven for defendant suffering from "advanced AIDS, . . . diabetes and artery disease"). Accordingly, as with the other mitigating factors, number eleven had no credible support in the record. See Dalziel, 182 N.J. at 504-05.

Furthermore, the judge provided adequate reasons for imposing the twenty-year prison term for D.W.'s homicide. The sentence is reasonable and does not shock the judicial conscience. See Fuentes, 217 N.J. at 70 (quoting Roth, 95 N.J. at 364-65).

We therefore conclude that the judge followed the sentencing guidelines and there is sufficient credible evidence in the record to support the judge's

findings on the aggravating and mitigating factors. We reject defendant's contention that the judge failed to adequately weigh the aggravating and mitigating factors.

For the first time on appeal, defendant argues the judge erred by ordering $12,750 in restitution to be paid to the victim's family without first determining his ability to pay. Therefore, we review the lack of an ability-to-pay hearing for plain error under Rule 2:10-2 and will not set the decision aside unless it was "clearly capable of producing an unjust result . . . ."

Pursuant to statute:

> The court shall sentence a defendant to pay restitution in addition to a sentence of imprisonment . . . if:
>
> > (1) The victim, or in the case of a homicide, the nearest relative of the victim, suffered a loss; and
> >
> > (2) The defendant is able to pay or, given a fair opportunity, will be able to pay restitution.
>
> [N.J.S.A. 2C:44-2(b).]

N.J.S.A. 2C:44-2 "grants to the court considerable discretion in evaluating a defendant's ability to pay" restitution. State v. Newman, 132 N.J. 159, 169 (1993). "The evaluation is necessarily imprecise because it contemplates an examination of the future ability to pay if the defendant currently does not have

financial resources." Id. at 169. "[H]owever, that discretion is not unfettered." State v. Scribner, 298 N.J. Super. 366, 371 (App. Div. 1997).

As a general rule, "a restitution order will not survive appellate review if the sentencing court has not specified the restitution amount and determined whether the defendant will be capable of paying the amount required." RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 478 (2018). In State v. Orji, 277 N.J. Super. 582, 589 (App. Div. 1994), however, where defendant's counsel conceded that the client had the funds to pay restitution and did not object to the amount of the award, we declined to vacate the award on appeal, notwithstanding the lack of an ability-to-pay hearing. Because the pre-sentence investigation report reflected that the defendant had a bachelor's degree and was gainfully employed, we held that "the judge properly could have inferred that defendant had the ability to pay the restitution ordered;" Ibid. but see State v. McLaughlin, 310 N.J. Super. 242, 264-65 (App. Div. 1998) (distinguishing Orji and requiring ability-to-pay hearing on $271,000 restitution award due to silence of record on defendant's financial resources and likely future earnings).

Here, the pre-sentence report similarly established that defendant earned a bachelor's degree and, prior to incarceration, had been employed for fourteen years as a landscape architect. Defendant told probation specifically that he

would "pay all [c]ourt imposed fines." In his sentencing memorandum, defendant expanded further on his work history, noting that he started his own landscaping business, had operated it for nearly a decade, and grew his business by incorporating computer renderings into his designs. In addition, defendant used his earnings to financially support his mother when she was ill up until her death in 2013.

While the judge could have engaged in a more fulsome inquiry of defendant's future earnings under N.J.S.A. 2C:44-2(c)(2), we conclude there was no plain error, because the judge "could have inferred that defendant had the ability to pay the restitution ordered," given his employment history, his statement to probation that he was willing to pay the fines, and his submission to the judge's discretion on the subject. Orji, 277 N.J. Super. at 589.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4034-17T4